All the Justices concurring.

THE ST. LOUIS, FORT SCOTT & WICHITA RAILROAD COMPANY v. FRANCIS TIERNAN.

1. DIRECTORS — *Fixing Salaries of Officers — Common Agreement.* The board of directors of a railroad company can, by resolution at one of its meetings, fix the salaries and order payment of the officers of the company who commenced to work for the success of the enterprise at a time when the company had no funds, with a common understanding and agreement that if they succeeded in building any portion of the road sufficient to produce a revenue, a fair compensation should be paid them out of the revenue so produced, and such compensation and payment may be fixed and ordered paid long after the services are performed. The case of *Drake v. National Bank*, 29 Kas. 311, cited and distinguished.

2. RECORD, *Parol Evidence to Correct.* Parol evidence is admissible to show that a resolution of the board of directors of a railroad company, entered upon the record of its proceedings, did not correctly recite the amount of money found due and ordered to be paid to one of its officers.

3. NOTE, *Made by Railroad Company; Defense, Not Good.* Where the board of directors of a railroad company, at a regular meeting, authorized and directed its promissory note to be executed by the president of the company, in payment of the salary of one of its officers, when a by-law of the company provided that it shall be drawn by the auditor to the president, etc., it is not a good defense to an action on the note that there had not been a strict compliance with all the requirements of the by-laws in the execution of the note. The

services having been performed, for the payment of which the note was issued by the company, any matter of form and not of substance ought not to defeat the recovery.

4. NOTE, *Authority to Make; Practice.* The authority of the officers of the railroad company to execute the note having been put in issue by the sworn answer of the company, some preliminary proof of their authority should have been given before the note was read in evidence, but this error was cured by the subsequent introduction of evidence tending to show all the circumstances under which the note was executed.

5. PART PAYMENT; *Acknowledgment of Liability.* Part payment by order of the managing officer of a railroad corporation, of a claim of one of its officers for two years' salary, the payment having been made subsequent to the rendition of the service, is an acknowledgment of liability on the part of the company.

6. CORPORATION — *Existence Begins, When — Fiduciary Relation.* A person who signs his name to the charter of a contemplated railroad company some time before it is filed in the office of the secretary of state, does not by that act alone assume a fiduciary relation towards the projected corporation. A corporation has no existence until the date of the filing of its charter, and the persons named therein as directors for the first year assume or incur no obligations until it is filed.

7. PROMOTER *of Railroad Corporation.* To constitute a person a promoter of a railroad corporation, it must affirmatively appear that he was acting for and in behalf of the proposed incorporation, or that he assumed to so act, and that on the strength of this authority or assumption the party complaining so dealt with him.

8. RAILROAD BED, *Owners May Sell—Terms of Sale.* The owners of a graded railroad bed can sell the same to a railroad company, whose officers, directors and stockholders are composed of the owners of the road-bed, and receive in payment therefor shares in the capital stock of the railroad company, at a time when those who sell the road-bed and own and control the railroad company are the absolute owners of all the stock issued by the railroad company, and where the terms of sale and the issue of stock are matters of record on the books of the railroad company, and where the transaction occurs months before any other or additional stock is issued by the railroad company.

*Error from Bourbon District Court.*

ON December 10, 1884, *Francis Tiernan* filed his petition against *The St. Louis, Fort Scott & Wichita Railroad Company,*

in the district court of Bourbon county, in the words and figures following, (court and title omitted,) to wit:

"The plaintiff for cause of action says:

"I. That the defendant is a corporation duly organized under and by virtue of the general laws of the state of Kansas.

"That the defendant is indebted to this plaintiff upon a promissory note, of which the following is a copy, to wit:

"'FORT SCOTT, March 10, 1882.— One hundred and eighty days after date, the St. Louis, Fort Scott & Wichita Railroad Company promises to pay to the order of Francis Tiernan, ten thousand dollars, value received, payable at the First National Bank, Fort Scott, Kansas, with interest from date at ten per cent. per annum, the same being for salary from February 3d, 1880, to February 3d, 1882.

"'ST. LOUIS, FORT SCOTT & WICHITA R. R. CO.

"'By A. M. AYERS, President.

"'Attest: IRA D. BRONSON, Secretary.

"'(Seal.—St. L., Ft. S. & W. R. R. Co.)'

"That said note was for salary as president and vice president and general manager from February 23d, 1880, to March 7th, 1882, and by mistake the recital was as above set forth.

"Wherefore, plaintiff demands judgment on said note as against this defendant in the sum of ten thousand dollars, with interest at ten per cent. per annum from March 10th, 1882.

"II. And for a second and further cause of action this plaintiff says, that the defendant is indebted to this plaintiff for salary as president and general manager of this defendant railroad company from March 7th, 1882, to March 7th, 1884, at an agreed and understood rate of five thousand dollars per year; and this plaintiff alleges that he was, and acted and performed the duties and services of, president and acting general manager of said defendant railroad company during the whole period of time from March 7th, 1882, to March 7th, 1884, and that such services were well worth the sum of five thousand dollars per year.

"And this plaintiff alleges that he has received from said railroad company, this defendant, at various times, the following sums and amounts of money, which he hereby credits and applies upon his account for salary from March, 1882, to March, 1884, to wit:

| | |
|---|---|
| By corn delivered in 1882 | $48 60 |
| "        "        1883 | 52 35 |
| 1883, cash received to settle Whittaker claims | 1,500 00 |
| Oct. 21st, 1884, cash on account | 3,000 00 |
| Total | $4,600 95 |

"Wherefore, plaintiff prays judgment against the defendant in the sum of ten thousand dollars, with interest at seven per

cent. on five thousand dollars from March 7, 1883, and interest on five thousand dollars from March 7, 1884, less said credit of four thousand and six hundred and $\frac{95}{100}$ dollars.

"Wherefore, plaintiff demands judgment against the defendant for fifteen thousand three hundred and ninety-nine and $\frac{5}{100}$ dollars, with interest at ten per cent. per annum from March 10, 1882, and costs of this action."

On January 10, 1885, the defendant filed its answer in words and figures as follows, to wit, (court and title omitted:)

"I. The defendant, for answer to the first cause of action in plaintiff's petition set forth, says:

"That the pretended promissory note therein set forth was not executed by this defendant, and that A. M. Ayers, as president, and Ira D. Bronson, as secretary of this defendant, were not authorized by this defendant to execute the same, and that the same is not the note or obligation of this defendant.

"STATE OF KANSAS, COUNTY OF BOURBON, ss.— J. W. Miller, being duly sworn, says that he is vice president and general manager of the defendant herein, the St. Louis, Fort Scott & Wichita Railroad Company; that he has read and knows the contents of the foregoing answer, and that he verily believes the statements therein made are true.

J. W. MILLER.

"Sworn to and subscribed before me, this 8th day of January, 1885.
[Seal.]                                      J. S. WEST, *Notary Public.*
                                      (Commission expires March 17, 1885.)

"II. For a second and further answer to the first cause of action in plaintiff's petition set forth, defendant says that it is and has been a duly incorporated railroad company under the laws of the state of Kansas, from and since February 23d, 1880; that the plaintiff was one of its original promoters, incorporators and directors, and has, from February 23d, 1880, continuously remained a director, and is such now, having during all that time assumed and taken upon himself the duties of a director, and continued and acted as such; that on February 28th, 1880, the plaintiff was elected president of this defendant, and acted as such to March 9th, 1881, at which time he was elected vice president and general manager, and so continued and acted as such to March 10th, 1882: that on May 10th, 1880, the plaintiff was elected a member of, and chairman of, the executive committee of the board of directors of this defendant, said executive committee being, by resolution of the board of directors, vested with the power of making contracts, transacting business, and appointing offi-

39 — 37 KAS.

cers on behalf of and for this defendant, and from May 10th, 1880, to March 10th, 1882, said executive committee exercised such powers, and were during that time mainly the managing body of the corporation; that previous to March 10th, 1882, no promise, agreement or contract had been made by this defendant to or with the plaintiff to pay him any sum of money for his services as president, vice president, director, or general manager; that he agreed to serve as such without the payment of any salary therefor.

" III. The defendant, for answer to the second cause of action in plaintiff's petition set forth, admits the payment to the plaintiff of the sum of $4,600.95 at the times therein stated, but defendant says that this sum of money was paid by the officers of this defendant without authority from this defendant, and when the plaintiff had no just demand therefor against this defendant, and that the plaintiff wrongfully appropriated the same to his own use; and except as herein admitted, defendant denies all, each and every allegation in said second cause of action set forth, and demands judgment against plaintiff for the sum of $4,600.95, and interest from this date.

" IV. The defendant, for further answer to plaintiff's petition and for cause of action against him, says that this defendant was duly incorporated as a railroad company, under and by virtue of the laws of the state of Kansas, on February 23, 1880, for the purpose of constructing and operating a line of standard-guage railroad from a point on the eastern line of said state, east of Fort Scott, in Bourbon county, to Kingman, in said state, a distance of about 250 miles, and that from the time of its incorporation up to this time it has continuously exercised the rights, powers, privileges and franchises of a railroad company under the laws of the state of Kansas; that the plaintiff was one of its original promoters, incorporators and directors, and has, from February 23, 1880, continuously remained a director, and is such now, having during all that time assumed and taken upon himself the duties of a director, and continued and acted as such; that on February 28, 1880, the plaintiff was elected president of this defendant, and acted as such to March 9, 1881, at which time he was elected vice president and general manager, and so continued and acted as such to March 10, 1882; that on May 10, 1880, the plaintiff was elected a member of, and chairman of, the executive committee of the board of directors of this defendant, said executive committee being, by resolution of the board of directors, vested

with the power of making contracts, transacting business, and appointing officers on behalf of and for this defendant, and from May 10, 1880, to March 10, 1882, said executive committee exercised such powers, and were during that time mainly the managing body of the corporation; that as such president, vice president, general manager, member of, and chairman of, the executive committee of the board of directors of this defendant, the plaintiff was the managing and chief administrative officer of this defendant; that on January 12, 1881, the plaintiff and one A. M. Ayers, who was then a director and vice president of this defendant, and one J. J. Franklin, who was then the treasurer of this defendant, purchased of one M. S. Carter the road-bed of what was theretofore known as the 'Fort Scott, Humboldt & Western Railroad Company,' in the counties of Bourbon and Allen, in the state of Kansas, the same consisting of some grading which had been done some ten years prior thereto on a contemplated line of railroad between Fort Scott and Humboldt, but which had long been abandoned—the plaintiff, said Ayers and Franklin, paying to said Carter therefor the sum of fifteen thousand dollars, which was the full value thereof; that on January 13, 1881, at the time when this defendant was greatly indebted beyond its ability to pay, and when very little, if any, of its line of railroad had been constructed, the plaintiff and said Ayers wrongfully, fraudulently, and in utter disregard of the duties which, as officers and directors of this defendant, they owed to it, and by collusion with their associate officers and directors, and in fraud of the rights of this defendant, its stockholders, bond-holders and creditors, the public and the state of Kansas, procured their said associate officers and directors to purchase of them the said road-bed so purchased of said Carter—the plaintiff and said Ayers having previously, on November 12, 1880, procured the passage of a resolution to that effect at a meeting of the board of directors of this defendant, at which the plaintiff and said Ayers were present, and in which they participated, and voted in favor of said resolution. As the purchase-price of said road-bed, the plaintiff, said Ayers and Franklin procured to be paid to themselves, of the moneys of this defendant, the sum of two hundred thousand dollars, the same having been finally paid to them June 12, 1882. In addition to the said sum of money so paid to them as aforesaid, the plaintiff, said Ayers and Franklin procured to be issued to themselves three million six hundred thousand dollars of the capital stock of this defendant, the plaintiff receiving as his share of the

money so paid the sum of sixty-six thousand six hundred and sixty-six dollars, sixty-six and two-thirds cents; and of the capital stock of this defendant the sum of one million two hundred thousand dollars. This defendant received no other consideration for said sum of money so procured by said parties to be paid to themselves, and the capital stock of this defendant, so procured by them to be issued to themselves, than the said road-bed so purchased by them of said Carter.

"This defendant further says that its capital stock, at the time it was so procured by the said parties to be issued to themselves, was of the value of one hundred cents on the dollar.

"Wherefore, defendant prays judgment against the plaintiff, for the value of said money and capital stock, in the sum of three million eight hundred thousand dollars.

"Wherefore, upon all causes of action hereinbefore stated in favor of the defendant and against the plaintiff, the defendant prays judgment against the plaintiff for the sum of three million eight hundred and four thousand six hundred dollars and ninety-five cents."

The plaintiff replied to defendant's answer as follows:

"The plaintiff, for reply to defenses numbers 1 and 2, in defendant's answer herein, says that he denies each and every allegation therein contained.

"For reply to defendant's answer number 4, filed herein, plaintiff denies each and every allegation therein, except as herein specifically admitted; and plaintiff says that he and A. M. Ayers and J. J. Franklin were the owners of the road-bed and old grade of the Fort Scott, Humboldt & Western Railroad Company, prior to the organization of this defendant railroad company; that upon the organization of this present railroad company, defendant herein, it was found desirable and necessary by it, for the success of this defendant corporation in building its proposed line of railway, to acquire said road-bed of the Fort Scott, Humboldt & Western Railroad Company, and upon a fair and full presentation of all the facts in the case to the board of directors of this defendant, and without any fraud or collusion, or underhand proceeding whatever, this plaintiff and his associates did sell the same to the railroad company, this defendant, for the notes of this defendant in the sum of two hundred thousand dollars, and for a majority of the stock of this defendant company to the nominal amount of its face value of three

million six hundred thousand dollars; that said notes at that time had no value whatever, and only could become of any value upon the success of the railroad company in building its road. The said stock had no value at the time of said sale, and has no market value now, and never had any value except for the purpose of securing the control of the railroad of the defendant; that only a portion of said notes has ever been paid; that said company, this defendant, only paid a fair price for said old road-bed, and the transaction was a fair and valid one in all respects, and was known to, and ratified and affirmed by, all the stockholders of the defendant corporation.

"And for a further reply to said answer number 4, this plaintiff says that more than two years have elapsed since said transaction, up to the bringing of this suit; and for a further reply, this plaintiff says that more than three years have elapsed between said transaction and the bringing of this action.

"And for reply to the third defense set up in defendant's answer, plaintiff says: That he denies that the payment therein admitted and set forth was the unauthorized and mistaken act of the officers of this defendant, but was a duly-authorized payment by this defendant to this plaintiff upon account, and for the purpose of being so applied, upon a due presentation of an account for services made by this plaintiff upon the defendant.

"Wherefore, plaintiff demands judgment as in his petition."

Afterward, defendant filed a denial of plaintiff's reply, in words and figures as follows, to wit:

"Defendant, with reference to plaintiff's reply to count number 4 of defendant's answer, denies all, each and every allegation in said reply contained, save and except so far as the same are admissions of the allegations of said count number 4 and of defendant's right to recover of plaintiff for the cause of action therein stated."

On October 5, 1885, the defendant filed an amendment to its answer, which is as follows:

"1. Defendant, by leave of court first had and obtained, files this, its amendment to its answer herein, and says that the plaintiff signed the articles of incorporation of the defendant, and became a director thereof, on the 19th day of January,

1880, and from that time up to the time of filing said answer continuously remained and acted as a director of the defendant.

"2. That the plaintiff Ayers and said Franklin paid M. S. Carter the $15,000 for the road-bed of the Fort Scott, Humboldt & Western Railroad out of the moneys belonging to this defendant."

The cause was tried at the September Term, 1885, by the court, without a jury, by agreement of parties, upon the pleadings as hereinbefore set forth. The court decided the issues in favor of the plaintiff, and rendered a judgment in his favor, the journal entry of which is as follows, (court and title omitted:)

"Now at this day this cause came on for hearing and trial by the court, both parties waiving the intervention of the jury. The plaintiff appeared by E. M. Hulett and J. D. Mc-Cleverty, his attorneys, and the defendant by J. H. Richards, A. A. Harris, and J. H. Sallee, its attorneys; and the court, having heard the evidence and arguments of counsel, and considered the same, finds upon the issues joined herein, in favor of the plaintiff and against the defendant, and that the plaintiff is entitled, in accordance with the allegations and prayer of his petition, to have the note sued on re-formed as prayed for, and for judgment upon both counts of said petition. "It is therefore by the court considered, ordered and adjudged, that said plaintiff have and recover of and from the said defendant the sum of twenty thousand and one dollars and fifty cents, and his costs, to be taxed herein, and execution is awarded herefor. It is further ordered that of said judgment the sum of thirteen thousand six hundred and fifty-three and $\frac{30}{100}$ dollars shall bear interest at the rate of ten per cent. per annum, and the sum of six thousand three hundred and forty-seven and $\frac{20}{100}$ dollars shall bear interest at the rate of seven per cent. per annum.

"To said finding and judgment, and to each and every part thereof, the defendant duly excepted and excepts."

On October 5, 1885, the defendant filed its motion for a new trial of said case, for reasons as follows:

"1. The said judgment and decision is contrary to law.

"2. The said judgment and decision is not sustained by sufficient evidence.

"3. Errors of law in the rejection and reception of testi-

mony, prejudicial to the defendant, occurring at the trial, and excepted to by the defendant at the time."

On October 5, 1885, this motion was heard and overruled. The defendant *Railroad Company* brings the case to this court.

*J. H. Richards, J. H. Sallee,* and *A. A. Harris,* for plaintiff in error.

*E. M. Hulett,* and *J. D. McCleverty,* for defendant in error.

Opinion by SIMPSON, C.: The investigation of the important questions involved in this case has been much lightened and expedited by the very careful and judicious preparation of the cause for review in this court. The record of the case-made is printed in large, clear type, and supplied with a thorough and admirable index; the documentary evidence is arrayed in the natural order for examination; and, in a word, everything has been done to lessen the labor of the court, and to render its discharge of duty easy and pleasant. We express the obligation of the court to counsel for plaintiff in error, for their care and skill in the preparation of the case for review here. Counsel on both sides have exhausted the sources of information on the legal questions involved, and left to the court nothing to complain of in this regard. Condensing the documentary and oral evidence into a brief summary, and reciting both in chronological order, the material facts are as follows: The note sued upon by the plaintiff below was executed by the president of the railroad company, and it was claimed that this was done in pursuance of a resolution of the board of directors, adopted at a meeting held on the 10th day of March, 1882. The authority of the president to execute the note is denied by a verified answer. As this is one of the most vigorously contested questions in the case, we pass it for the present. The residue of the plaintiff's demand against the railroad company consisted of a claim for salary as president and general manager from March 7th, 1882, to March 7th, 1884, at an established rate of $5,000 per year; and about this part of the claim there does not

seem to be much controversy. The answer of the defendant below alleges that Tiernan and Ayers were promoters, incorporators and directors of the railroad company, and that Tiernan was its president and active manager; that while acting in that capacity, he and Ayers, on the 12th of January, 1881, purchased from one M. S. Carter a road-bed of a defunct railroad corporation extending from Fort Scott to Humboldt, at its full value for $15,000, and then, in collusion with other certain officers and directors of the St. Louis, Fort Scott & Wichita Railroad Company, sold it to that company for the sum of $200,000 cash, or its equivalent, and $3,600,000 of the capital stock of said company; that this was done in violation of their obligations and duties as officers of said railroad company; and that the stock was of par value; and defendant prays for a judgment against Tiernan for $3,804,600.95.

For some years before the organization of the St. Louis, Fort Scott & Wichita Railroad Company, there had been graded a road-bed, with some bridges built on it, from Fort Scott to a little distance beyond Humboldt, by an organization known as the Fort Scott, Humboldt & Western Railroad Company. The length of this road-bed was about forty-four miles. The company which had graded the road-bed and built the bridges had failed, and one M. S. Carter had foreclosed a mortgage against it, and bid in its property, consisting of the road-bed and bridges, and had become the absolute owner thereof. On the 17th day of February, 1880, Carter sold this road-bed to Francis Tiernan and Alexander M. Ayers, together with all maps and profiles in the possession or in the control of Carter, of said line of road between Fort Scott and Humboldt, and thence westward or southwestward through the state of Kansas. · The consideration of this sale was the sum of fifteen thousand dollars, to be paid as follows: one thousand dollars within ninety days, and fourteen thousand dollars within one year, and the additional agreement that the said Tiernan and Ayers were to commence within thirty days to procure the unsecured right-of-way over which the said road-

bed or line of railroad was originally surveyed, established and partially graded, and all deeds and contracts for the right-of-way, side tracks and switches, depot grounds, tanks, and stock yards, were to be taken in the name of M. S. Carter, and were to inure to his benefit and to be absolutely his until Tiernan and Ayers paid in accordance with the terms herein specified; and Tiernan and Ayers agreed that within ninety days they would use their best endeavors to secure aid to said road, by procuring bonds to be voted by the various municipalities through which said line would pass in Bourbon and Allen counties, and that all such aid procured in the construction of a railroad from Fort Scott to Humboldt should accrue to the benefit of Carter and become his property if they should fail to pay him as specified. The terms of this agreement were reduced to writing, and signed by the parties on the 17th day of February, 1880. The first one thousand dollars was paid on the 14th of May following. On the 23d day of February, 1880, the charter of the St. Louis, Fort Scott & Wichita railroad company was filed in the office of the secretary of state. It was signed and acknowledged by Francis Tiernan and Alexander M. Ayers in Champaign county, Illinois, on the 20th day of January, 1880. On the 20th day of February, 1880, the company was organized at Fort Scott by the election of Francis Tiernan as president, Alexander M. Ayers as vice president, and Ira D. Bronson as secretary.

On the 17th day of April, 1880, Tiernan and Ayers sold to John J. Franklin, of Philadelphia, one-third interest in the road-bed known and called the Fort Scott, Humboldt & Western Railroad, commencing at Fort Scott and running to Humboldt, the estimated distance being forty-four miles, for the consideration of twenty-five thousand dollars. Of that amount five thousand dollars was to be paid as soon as Franklin could examine the title and approve it, and the sum of twenty thousand dollars was to be paid within eight months. When Franklin paid the $5,000 he was to be elected treasurer of the St. Louis, Fort Scott & Wichita Railroad Company. Sometime during the month of May, 1880, the St. Louis, Fort Scott & Wichita

Railroad Company made an agreement to purchase the old road-bed of the Fort Scott, Humboldt & Western Company, and it is this agreement which is hereafter referred to in the minutes of the meeting of the directors of the St. Louis, Fort Scott & Wichita Railroad, held on November 12, 1880. On the 12th day of November, 1880, the directors of the St. Louis, Fort Scott & Wichita Railroad adopted a resolution approving and confirming the contract of Tiernan, Ayers and Franklin of the sale by them, and the purchase by the company, of the road-bed, etc., ordering the issue and delivery of the stock, and the execution and delivery of orders for cash, or first-mortgage bonds, as provided in the agreement of sale. On the 3d day of December, 1880, Franklin sold to Ira J. Bronson all his right, title, interest and claim in and to the St. Louis, Fort Scott & Wichita Railroad Company, and the old road-bed, etc. On the 6th day of March, 1881, at a meeting of the stockholders of the St. Louis, Fort Scott & Wichita Railroad Company, the following resolution was adopted, by a vote of all the stockholders present, in its favor:

"*Be it resolved*, That all actions of the board of directors of the St. Louis, Fort Scott & Wichita Railroad Company, in relation to selling and disposing of the capital stock of said railroad, and receiving payment therefor in the manner and kind in which such payments were made, be and they are hereby approved and ratified."

The road-bed was paid for by issuing to Francis Tiernan, Alexander M. Ayers and Ira J. Bronson, or his assignee, each $1,200,000 of paid-up capital stock, and an order on the railroad company in favor of each one of these persons for $66,666.66⅔ in cash, or first-mortgage bonds, but the order for cash or bonds was in no manner to become a lien on that part of the road running from Fort Scott to a point where it crosses the Kansas City, Lawrence & Southern Kansas Railroad in Allen county. At the time of these various transactions about the old road-bed there had been no amount of the capital stock of the railroad company issued, the first being issued to one L. M. Bates, of New York, in December, 1880.

Bates was an assignee of Ira J. Bronson for a part of Bronson's share of the stock of the purchase of the road-bed.

On this state of facts, supplemented by the other acts of the parties, which will be noticed hereafter, the contention of counsel for plaintiff in error is:

*First,* Tiernan was president, general manager and chairman of the executive committee for two years, during which time no agreement existed whereby he was to be paid for his services, and at the end of that time he and his associate directors could not legally vote him a salary for services theretofore rendered.

*Second,* Ayers, Bronson and Hill were respectively vice president, secretary and superintendent of the company during the time Tiernan was president. No contract or agreement had been made whereby they were to be paid a salary, and no resolution or by-law had been adopted to that effect. At a meeting of the directors, at which Tiernan, Ayers, Hill, Bronson and another, who was a subordinate officer of the company, only were present, and no notice of the meeting had been given to the absent directors, a resolution could not be legally adopted allowing salaries to Tiernan, Ayers, Bronson and Hill for services theretofore rendered, and authorizing the execution of the company's notes therefor.

*Third,* The by-laws of the company, adopted by the stockholders at a meeting regularly called for that purpose, provided the manner in which the company's notes should be executed, and persons who were both stockholders and directors, and who had favored the adoption of such by-laws, could not ignore them and procure the company's notes to be executed to themselves in a manner different from that prescribed in the by-laws.

*Fourth,* Tiernan and Ayers, occupying the positions hereinbefore recited, bought an old road-bed which the company needed, for fifteen thousand dollars, and for the purpose and with the intention of selling it to the company, with an agreement among themselves, Bronson and Hill, to divide the profits of the transactions, sold it to the company for $200,000 cash and

$3,600,000 of the company's capital stock, and then carried out their agreement about the division of profits. The company is entitled to recover of Tiernan the difference between the price paid by him and Ayers for the road-bed and that at which they sold it to the company.

*Fifth*, Tiernan and Ayers did not disclose to any of their associate directors, except Bronson and Hill, the price paid by them for the road-bed, and the other five directors had no knowledge on that subject. Such a transaction will not be upheld when it is challenged in a proper action by the company.

*Sixth*, Tiernan took $3,600,000 of the company's capital stock in the manner above set forth, and in a proper action by the company he is answerable to it for the par value of the stock, and judgment should be rendered against him accordingly.

*Seventh*, Tiernan was a director from the time of the organization of the company down to the time of the commencement of the action to recover for the matters hereinbefore referred to, and as during all that time he was trustee for the company, statutes of limitation did not commence to run as long as that relation continued.

## CONTENTIONS AS TO THE NOTE.

Numerous questions arose on the pleadings, and at the trial. with reference to the authority of the board of directors of the railroad company to execute the $10,000 note set forth as the first cause of action in the petition of the plaintiff below; and they are as follows:

*First.* It is claimed that after services had been performed by Tiernan as president of the company, without any express agreement as to their value and payment, the board of directors could not legally vote him a salary for past services. We do not think this objection fairly states the facts in this particular case, for this reason, that there is in the record some evidence tending to show that there was a common understanding among those persons who were actively engaged in the work of the company that they were to receive compensation for such ser-

vices. It is true that the record does not disclose any affirmative action by the governing body of the company at the commencement of these services, or for a long time thereafter, declaring a liability and providing a measure of compensation in respect to them, but the fact remains that they all went to work with a common understanding that if their united efforts were successful, and anything substantial resulted from their labors, fair pay for labor performed would follow. It must be recollected that the only capital this railroad company possessed at its birth and in its earlier struggles for existence was the energy and capacity of Tiernan, Ayers, Bronson, and Hill. They necessarily reserved the question of compensation for the future, to be settled and determined by the success attained, for unless their labors resulted in the construction and equipment of a railroad there would be no revenue produced sufficient to pay expenses or salaries. If their projected road became an accomplished fact, the measure of compensation was to be determined by the degree of success. If there is any one thing more manifest in the record than all others, it is the tireless energy and wonderful management of these four men in the organization of the company and the success of the enterprise.

1. Directors— fixing salaries of officers— common agreement.

It may be fairly said that the resolution of the board of directors of the company, passed on the 10th day of March, 1882, allowing salaries to the persons therein named, was but expressive of the common understanding had at the commencement of the work that they were to be paid a reasonable compensation for services rendered whenever the success of the enterprise justified the payment.

This case differs from that of *National Bank v. Drake*, 29 Kas. 311, in this respect, for in the reported case it was claimed on the part of the bank that when Drake was appointed cashier he had agreed to act without compensation. He was a large stockholder, and was allowed room in which to transact his private business, and space in the safe of the bank in which to deposit his valuable private papers; and because he owned a large share of the stock, and was allowed

these other privileges and facilities for the transaction of his private business, he assumed the duties of cashier without other compensation. It is said in that case, page 330:

"As this case goes back for a new trial, we desire to add, to guard against any misconception, that we do not agree with all the authorities heretofore cited as to the lack of power on the part of the directors to appropriate money in payment of the salary of the cashier, or other officer, after the services have been rendered, and in cases when such cashier, or other officer, happens to be a director, we think the rule is, in the absence of positive restrictions, that when no salary is prescribed, one appointed to an executive office, like that of cashier, is entitled to reasonable compensation for his services, and that the directors have power to fix the salary after the expiration of the term of office, and this though such appointee is also a director, and continues to be such while holding the independent office."

We therefore conclude, that the board of directors had the power to pass the resolution of the 10th of March, 1882, for the reason that it only expresses a previous agreement, and that the board had the right to award reasonable compensation to an officer for services performed, after they had been rendered. It is not necessary, in view of the fact that there is ample testimony in the record to establish the common understanding existing as to compensation, to sustain our ruling in the case by that of the Drake case. The writer of this opinion has serious doubts as to the application of the rule in that case to the facts here presented, and is very decided in his conviction that such a rule can only be supported with reference to a class of appointive officers who have no control over the management and disposition of the property of a corporation. It is very clear that the learned judge who delivered the opinion in the Drake case, and had considered all the cases now cited, had the distinction between managing and controlling officers and ministerial ones in mind, and that his remarks were made with reference to that distinction.

*Second.* It is insisted by counsel for plaintiff in error that the resolution of the board did not authorize the execution and delivery of a note of $10,000 to Tiernan for his services. The

answer of the company denied the authority of its officers to execute the note sued upon. The answer was supported by an affidavit, and while this raised the other question disposed of above, this question still remains. The minutes of the proceedings of the directors' meeting held on the 10th day of March, 1882, recite that—

" *Whereas*, The salaries of A. M. Ayers, president, F. Tiernan, vice-president and general manager, J. D. Hill, superintendent, and Ira J. Bronson, secretary and treasurer, not having been heretofore fixed : therefore, it is

"*Resolved*, That the salaries of each of said officers be and the same are now fixed at $5,000 per annum from the 4th day of March, 1881, to March 7, 1882.

"*And whereas*, There is due F. Tiernan $5,000 on said salary, etc.;

"*And whereas*, This railroad company is now unable to pay such salary : therefore, be it

"*Resolved*, That the railroad company, by its president and secretary, at once execute and deliver its promissory note for the amount herein specified."

Then follows a resolution pledging some Eureka township bonds to secure the payment of the note, but this is not material. It was under and by virtue of the authority of this resolution that the $10,000 note sued upon was executed. The plaintiff below claimed that the record of the minutes when rightly understood would show the amount recited to be due Tiernan as $10,000, instead of $5,000; that the intention of all present and participating in the meeting was to authorize the execution of a $10,000 note, and that the record originally read $10,000, but had been changed to $5,000. The plaintiff introduced the testimony of several witnesses upon this question, over the objection of the railroad company, and may fairly be said to have established this state of facts: That the original proceedings of the meeting were noted on loose sheets of paper and afterward transcribed from those loose sheets into the record book, and the explanatory evidence consisted of a book called the record of "bills payable," in which was recited the notes executed by the railroad company. These recitals were made up by the direction of Bronson, the treasurer, the

entries being made a short time after the notes were executed. This book showed under date of March 10, 1882, "time, 180 days;" drawer, "The St. Louis, Fort Scott & Wichita Railroad Company," in favor of "Francis Tiernan;" where payable, "The First National Bank of Fort Scott;" due, "Sept. 6th, 1882;" amount, "$10,000." Bronson testified that he had in his possession the original short notes of the proceedings of the meeting, made on the day it was held, and as the transaction occurred. They read as follows: "March 10th, 1882, board convened pursuant to adjournment; present, same as yesterday'. Motion by Hill as to Malin bonds, carried; motion for salaries, $5,000 per annum. Motion as to note 180· days, and Eureka bonds, carried." Bronson produced a second paper, identified it as his handwriting, but did not give a very satisfactory account of its origin. The contents of this paper are substantially those of the first, except that the proceedings of the meeting are in greater detail. In this paper there is the statement that there is due Tiernan on his salary the sum of $10,000. It was first inserted in figures $5,000, and that is crossed out by parallel lines being drawn over it with a pen, and followed by the figures $10,000. Herrick, Bronson's clerk, who transcribed the minutes from these loose papers into the record book, testified that he had first written "Whereas there is due Tiernan on his salary $10,000," and had subsequently erased $10,000 and written $5,000, but that he had no recollection positively why the change was made, and that the erasure could be seen from the under side by looking through the leaf. Hill, who introduced the resolution about the salaries, testified that the object and purport of the resolution was to fix the salaries of these officers at $5,000 per annum for each year, for all the time past and all the time to come in the future.

This is enough of the evidence to show the character of the objection made by the railroad company to its introduction. This objection is two-fold: in one of its features it is technical, being confined to the admissibility of parol evidence to vary, contradict or impeach the record. The other feature

goes to the authority of the board of directors to execute the notes of the company, except in the manner and under the conditions prescribed in its by-laws. On the first feature, or reason given to sustain the objection, we think reason and authority alike concur in affirming the ruling of the trial court. That parol testimony is admissible for the purpose for which it was admitted in this case, is manifest from the decision of this court in the case of *City of Troy v. A. & N. Rld. Co.*, 11 Kas. 519, and this on the theory most favorable to the plaintiff in error, that the record book absolutely stated that the amount due was $5,000. The precise contention here is, what did the record say — $5,000, or $10,000 ? Herrick says that it was first written $10,000 and then changed to $5,000, and this leaves the question as to what are the facts, an open one. Official bodies, such as the board of directors of a railroad company, have the same right as courts of record to make their journals speak the truth; or if a question arises as to just what facts the record does state where it contains erasures and interlineations, what did occur and was attempted to be recorded, can be established, to aid in the construction of the recitations in the record. We are not disposed to disturb the finding of the trial court in this respect, necessarily included in the general judgment rendered in favor of the plaintiff below, because it seems to have been amply justified by the evidence introduced, and this evidence is reinforced by the strongly suggestive fact that on the very day that this resolution was adopted, the note was executed for $10,000.

*2. Record, parol evidence to correct.*

The other ground of objection can be stated in a few words: A by-law of the company adopted at a meeting of the stockholders provided, "If cases arise in which it may become necessary to issue the notes of the company, instead of its acceptances, such shall be drawn by the auditor to the president or vice president, countersigned by the treasurer, and a proper record made of their maturity by the latter officer." Who shall determine when it shall become necessary to issue the

40 — 37 KAS.

notes of the company but the governing body, the board of directors? Then the objection goes, not to the authority of the board, but the mere form of the note. It is objected to because not drawn in accordance with the requirements of the by-law. It is, in effect, saying, We will not pay this paper, because it is not in exact accordance with the form we have prescribed for our notes. We suppose that, in the absence of any by-law prescribing the form or authorizing the issuance of promissory notes of the corporation, if it became necessary in the transaction of the ordinary business of the company, the president, by the order of the board of directors, could execute the promissory note of the corporation for

3. Note, made by railroad company; defense, not good.

a valuable consideration; and as this objection is clearly technical, and goes to the form and not to the substance, it ought not to be allowed to bar a recovery. The execution of the note is the act of the company, done in pursuance of an order made at a meeting of its directors, made in accordance with an agreement between its creditors and the company, delivered because the company had not the money to pay for services rendered, and for which payment was due and ought to have been made; and the company ought not now to be allowed to say, We will not pay this company's note, because it is not drawn in strict conformity to the company's by-laws. Even a cursory glance at the two authorities cited by counsel, 1 Woolworth, 400, and 2 Atkyns, 400, ought to have satisfied them that in those cases the court was considering matters of substance and not of form. The question as to whether the facts existed which authorized the officers of a railroad company to execute its notes, is a different question from whether the notes are in the exact form prescribed in the by-laws, or not. The first determines the existence of the notes, the other concedes the right to issue, but insists on a certain prescribed form. In *Samuel v. Holladay*, 1 Woolworth, 400, the question was, whether or not a deed of trust was void because the meeting of directors at which it was executed was held without the notice prescribed for such meeting by the by-laws of the company. In *Charitable Corporation*

*v. Sutton*, 2 Atkyns, 400, the officers of the company lent money on pledges, repeated loans on the same pledges, and on imaginary pledges, in violation of the by-laws.

*Third.* Another error assigned and urged for reversal is this: The court admitted the note in evidence when only the signature of the officers excuting it had been proved, and this was done over the objection of the plaintiff in error. The authority of the officers of the company who had executed the note to make it, was put in issue by the sworn answer of the company, and under the state of the pleadings at the time of the trial some preliminary proof of the authority of the officers to execute the note should have been given before it could be permitted to be read. If this ruling stood alone, isolated from the other facts and rulings of the court, it could not be sustained; but the error was subsequently cured by the admission of the parol and other evidence heretofore noticed, tending to show the power of the officers under the resolution adopted at the meeting on the 10th of March, 1882, and hence the ruling complained of does not operate to the prejudice of the plaintiff in error.

4. Note, authority to make; practice.

This disposes of the first three contentions of the plaintiff in error.

AS TO THE TWO YEARS'.SALARY.

Counsel for the plaintiff in error do not indulge in a very lengthy controversy about the two years' salary, which constitutes the second cause of action in the petition of the plaintiff below, but what is said may be resolved into these two objections: First, the resolution adopted by the board of directors at the meeting held on the 10th of March, 1882, did not fix the salary for the future; second, the payments made thereon, made by the auditor of the company, were without authority, and did not bind the company to make any further payments.

The proper solution of the first objection depends upon the construction to be given the resolution of the 10th of March, 1882. Construing it in the light of the testimony of its author, and it appears that it was intended to fix the salary at

$5,000 per annum for the past and for the future, and in the absence of all evidence it would seem that this is the natural inference from the words of the resolution. The salary was fixed at a definite sum per annum, and then in view of all the other facts apparent on the face of this resolution, it was determined what was due for past services. Under and by virtue of this resolution, as it remained on the record of the proceedings of the board of directors, any person who had succeeded Tiernan in the office could have reasonably concluded that his salary was fixed at $5,000 per annum. There does not seem to be any dispute but that Tiernan performed the services for the payment of which he seeks to recover, and as the record discloses that about this time he sold out all the stock he had, and the others ceased to have any connection with the company, Tiernan could certainly recover the value of services performed at the rate established by the resolution, unless there is some affirmative showing of a different agreement.

A very short statement will dispose of the second objection. Tiernan was performing the duties of president and general manager of the railroad company from March 7, 1882, to March 7, 1884; during this time he was paid in cash, and articles described, the sum of $4,600.95. These payments were made by the auditor of the company, the last one of $3,000 cash, being made on the 21st day of October, 1884, at a time long subsequent to the performance of the services. This payment was made by the order of one Miller, who was then vice president and general manager of the company, who gives in his testimony the reasons that prompted the payment.

5. Part payment; acknowledgment of liability.

A part payment is an admission of some liability. We think that the officers of the company, under the facts heretofore stated with reference to the resolution of the board of directors, had authority to make the payment, and that Tiernan is entitled to recover the balance due.

### AS TO THE ROAD-BED.

1. Some very important questions grow out of the purchase of the road-bed by Tiernan and his associates, and their sale

of it to the railroad company. It is alleged in the answer of the railroad company, that at the time the purchase was made Tiernan was one of the incorporators and directors of the company, and occupied such a position toward the company that whatever dealings he had respecting the road-bed resulted to the benefit of the corporation; or, that if this is not so, then if he made the sale to the company while acting in the capacity of president and director, he was bound to disclose the price he paid, the profit he was making, and that the whole transaction must be characterized by fair, open and unmistakable candor in all its features. The first question we shall discuss is, were the defendants in error, Tiernan and Ayers, corporate fiduciaries at the time they purchased the road-bed? They signed and acknowledged the charter of the St. Louis, Fort Scott & Wichita Railroad Company on the 20th day of January, 1880, at Champaign county, state of Illinois. It was filed with the secretary of state on the 23d day of February, 1880. The contract of purchase of the road-bed was made on the 17th day of February, 1880. It thus appears that the road-bed was purchased before the railroad company had any existence. Section 10, chapter 23, of the Compiled Laws of Kansas, 1885, being the act concerning private corporations, is as follows: "Sec. 10. The existence of the corporation shall date from the time of filing the charter, and the certificate of the secretary of state shall be evidence of the time of such filing." This express statutory declaration determines the fact that the railroad company had no existence prior to the 23d day of February. Important legal consequences flow from this determination. The legislature has prescribed the act that gives life to a corporation, and the date of the performance of that act is the birthday of its creation. From the moment of the filing of the charter with the secretary of state, the duties and obligations of those named as its first directors began. There could not have existed any fiduciary relations before that time, because there was no corporation in existence to create them. It is clear, then, that at the time they made the purchase of the road-bed, they were not direct-

ors, and did not occupy such a relation of confidence and trust to this railroad company, that this purchase was presumably for its benefit, or by operation of law resulted in its favor. All such theories and considerations are swept out of our pathway by the vigorous terms of the statute.

It is sometimes the case that parties who are dealing with each other about the organization of a corporation, make such declarations or give such pledges respecting its future creation, that causes of action arise between them which must be settled in accordance with the recognized rules of law with reference to contracts, agency, or partnership. There is nothing developed in the record which justifies the assertion that such causes of action arose against Tiernan and his associates on behalf of others who participated in the organization. We do not believe that anyone would seriously contend for a single moment that there is such a statement of facts in the record, that, if Tiernan had refused to sell his road-bed to the railroad company, it could have enforced the sale. To make him responsible in this action there must be an affirmative showing that at the time he made the purchase he was either acting for and on behalf of the company, or that he so assumed to act, or that he occupied such a relation of trust and confidence with respect to the company that his purchase resulted to its benefit, and not to his own profit. The first we regard as impossible, because at that time the company had no existence, and hence he could not have acted on its behalf or authority, and for the same reason he could not have assumed to act for a corporation when there was none in being.

6. Corporation— existence begins, when— fiduciary relation.

2. It is alleged in the answer of the railroad company that Tiernan was a promoter of the railroad company, and the same statement is repeated in the briefs with italicized vigor, and great stress seems to be laid upon the assumed fact. This word promoter had its origin in the methods by which joint-stock companies were formed in England, where by law they were declared partnerships. Subsequently, when the era of railroad building began in that country, the business of pro-

moting the organization of such companies assumed definite form. The ordinary proceeding was this: The promoter introduced the enterprise to the notice of persons of wealth in the locality through which the line of the road was proposed to be located, informing them of its nature and prospects, and furnishing an estimate of its probable cost. These persons were solicited to aid by their influence or subscriptions, or both. Enough persons were secured to constitute a provisional committee, and then this committee appointed from their number a managing committee, which issued a prospectus, announcing the nature and probable profits of the scheme, the proposed means to carry it out, the amount of capital required, the number and price of shares, and other details, to which were generally attached the names of the promoters, with references to the names of those persons constituting the provisional committees. If all this resulted in fair probabilities of success, application was then made to parliament for a bill of incorporation. If the scheme failed, the expenses incurred gave rise to litigation, and many questions as to the liability of these committees and of the promoters were determined. If the incorporation was secured by the action of parliament, then another class of questions arose as to what acts of the promoters could be ratified by, and what acts resulted to the benefit of, the incorporation, and many others growing out of the condition of affairs; that that has no resemblance to our method of organizing corporations. It is true that the word has been found to have its uses in our jurisprudence, but in a much more restricted sense than that used in the English reports.

The American cases upon this subject are not very numerous, and most all of them will be found in the 16th American Law Review, and in Morawetz on Corporations, vol. 1, p. 545. Assuming that a promoter is a person who organizes a corporation, and that he intends to sell its property, or to subscribe for its stock, or to take an active part in its management and business, let us inquire whether there are sufficient facts recited in this record to determine that the fiduciary relation

of promoter of this corporation was ever assumed by Tiernan, or whether his acts in respect to its organization were such that a relation of this character could fairly be inferred. To start on, there is not one single word of parol testimony which can be fairly said to authorize an inference that Tiernan was the promoter of the corporation. It does not appear that he ever advised or suggested the organization of the company. In the next place, there is nothing in very many voluminous written instruments in the record that justifies any such inference. The charter itself would seem to rebut any such conclusion so far as Tiernan was concerned, as it was signed and acknowledged by him in the state of Illinois. There is nothing to justify the allegation in the answer of the railroad company, or the assumption of its counsel in their briefs, that Tiernan was a promoter of the company.

There is in the written agreement between Tiernan, Ayers and Franklin, whereby a one-third interest in the road-bed purchased by them from Carter was sold to Franklin, an understanding on the part of Franklin that if Tiernan and Ayers wish to sell the road-bed to the St. Louis, Fort Scott & Wichita Railroad Company, Franklin will join in the conveyance of it to the company, if his share of the purchase-money is not less than $40,000, but this agreement was made on the 7th day of April, 1880, after the purchase by Tiernan and Ayers, and after the organization of the company; so that we cannot utilize this fact to establish a relation as existing before the railroad company had any corporate life. There is no evidence that Tiernan was a promoter.

3. At the time of the sale of the road-bed to the railroad company, Tiernan was part owner of the road-bed, and was a director and president of the railroad company; and hence it is very properly said that the sale must be a fair, open one in all respects; the price paid by Tiernan and his associates must have been disclosed to the directors of the company, and the whole transaction must not only be for the evident interests of the company, but it must have been conducted in all its stages in

*7. Promoter of railroad corporation.*

the utmost good faith on the part of the directors, and with a complete knowledge of the time when, the circumstances under which, and the exact amount paid by Tiernan at the date of his purchase, to be relieved of that suspicion with which courts of justice universally regard a transaction in which the seller and the buyer are represented by one and the same person. It has been decided that a director is not prohibited from dealing with his company; he can sell it real estate or any other kind of property, but there are certain rules strictly applicable to him that do not operate upon a person entirely disconnected with the corporation, and these he must faithfully observe to make his contract of sale one that the law will uphold. (*Hotel Company v. Wade*, 97 U. S. 13; Morawetz on Corporations, §§ 297, 521, 545; *Simmons v. Vulcan Oil Co.*, 61 Pa. St. 202; *Van Cott v. VanBrunt*, 82 N. Y. 535; *Parker v. Nickerson*, 137 Mass. 487.)

It has been decided, time and time again, that the owner of a mine, an oil well, or a valuable patent, can organize a corporate company to develop mineral, or oil, or to manufacture the patented article, take a very large amount of stock in payment of his mine, oil well, or patent, and trust to the value given the stock by the success of the corporation for payment of his labor and discovery. In this class of cases there is a mere transfer of the status of the mine, oil well, or patent. It ceases to be personal property, and becomes corporate property, and each individual interest, as well as that of the owner, discoverer, or patentee, is represented by shares of stock.

It is now decided in this case that the owners of a graded railroad bed can sell the same to a railroad company whose officers and directors are composed of the same identical persons who own the road-bed, and issue the capital stock of the railroad company in payment thereof, at a time when those who sell the road-bed and own and control the railroad corporation are the absolute owners of all the stock issued by the railroad company, and when the terms of sale and the issue of stock are matters of record on the books of the railroad company, and when this

8. Railroad bed, owners may sell — terms of sale.

transaction occurs months before any other or additional stock is issued by the company; that parties owning an old railroad grade with culverts and some bridges erected thereon, and who organize, control, manage, and own a railroad company, whose stock at the time of the issue has no market but only a nominal value, can transfer the railroad grade to the railroad company and issue the stock of the company in payment therefor; they, and they alone, at that time, being the only persons interested in the road-bed, and in the railroad company. At the time of the sale of the railroad grade, or old road-bed, it was owned by Tiernan, Ayers, Bronson, and Hill, and they in fact constituted the railroad company. There were some other directors, but the evidence is that just sufficient stock was placed in the name of the other directors to authorize them to act as such, and this transfer was but temporary, and for that sole purpose. This sale was ratified by the directors of the railroad company, and subsequently by the stockholders, but the directors, stockholders and owners of the road-bed were one and the same persons. By this transaction the value of the road-bed was represented by the stock of the railroad company, instead of remaining as the personal estate of the owners. At the time of the sale, and when the board of directors ordered the issue of the obligations and stock of the company in payment of the purchase-price of the road-bed, the record affirmatively shows that all the persons who had any interest of any kind or character whatever in the railroad company, except Bates, the assignee of part of Bronson's stock, were Tiernan, Ayers, Bronson, and Hill. They owned the road-bed, they constituted the railroad company, they sold the road-bed to the railroad company and took the stock of the railroad company in payment, at a time when witnesses on both sides concede that the stock had only a nominal value. The developments in this record abundantly show that the title to and possession of the road-bed were of great pecuniary benefit to the railroad company. It alone enabled the company to construct the first fifty miles of its road, and to make such a beginning that its future suc-

cess and final accomplishment were assured. The record does not show that there has ever been any other stock issued by the railroad company, except small amounts to municipalities through whose territory the line was built, and that it is owned, managed and controlled to-day by the amount of stock issued to pay for this road-bed. Tiernan and his associates sold their stock to Gould, in August, 1882, for a consideration of $100,000, so that now, so far as it appears, the value of the stock issued representing a completed road one hundred and fifty miles in length is much less than the actual cost of the road-bed. The railroad company in this action represents this stock, and it seeks to retain it. It has the use and enjoyment of the road-bed, and wants to recover from Tiernan the par value of the stock, being the sum of $3,600,000.

It is useless to pursue the discussion further, as it is not controlled, or governed, or affected in any degree by those self-evident, equitable principles, and unyielding rules of law that govern in all cases where persons sustain fiduciary relations to corporations, or to other persons, by reason of their being representatives of their pecuniary interests. This case involves the proposition as to whether or not the absolute owners of property can, when it seems to them to be to their profit, so change the relation of their property as to make it stock in a corporation. Whoever succeeded to the rights of Tiernan and his associates as the holders of the stock, did so with all the facts showing the sale and purchase of the road-bed and the issue of the obligations and stock of the railroad company spread upon its record, and have now no right to complain, however different the case might be if they had then an interest in the corporation. This same issue in its most important features has very recently been tried and decided by the circuit court of the United States for the district of Kansas, in the action of *E. R. Stewart v. The St. Louis, Fort Scott & Wichita Railroad Company,* a manuscript opinion of Judge Foster's having been furnished us. Stewart brought his action to recover on several promissory notes issued by the

railroad company, aggregating $85,000. These notes consti-
tuted a part of the $200,000 that was to be paid in cash, or
its equivalent, for the road-bed, and a $5,000 note issued to
Hill for salary as general manager. The same defenses which
are made here, were set up in that action. The circuit court
rendered judgment for the full amount claimed by Stewart,
overruled all the defenses and discussed very many of the
questions alluded to in this opinion, with the same result.

We see no material error in the record, and recommend that
the judgment of the district court be affirmed.

By the Court: It is so ordered.

All the Justices concurring.