### COMMISSIONERS OF JOHNSON COUNTY *v.* THAYER.

1. Under the act of the legislature of Kansas, approved Feb. 10, 1865, authorizing the board of county commissioners of any county to, into, through, from, or near which any railroad is or may be located, to subscribe to the capital stock of the company, the location of the road is not a condition precedent to submitting the question of subscription to a vote of the qualified electors of the county.

2. A proposition was submitted to the electors of Johnson County, whether the board should be " authorized to subscribe capital stock in the name and for the benefit of Johnson County, in the sum of $100,000, to aid in the construction of a railroad commencing at or near the Union Depot, on the south side and near the mouth of the Kansas River, and near Kansas City; thence to Olathe, in Johnson County; thence, in a southerly direction, through said county to the southern boundary of the State of Kansas." *Held*, that, under the statute, this was a sufficiently specific description of the route of the contemplated road, and that it was not necessary to insert the name of the company constructing it.

3. Irregularities or informalities, not involving the question of jurisdiction nor affecting the result of the vote, do not impair the validity of the bonds issued pursuant to the election; and the Curative Act of Feb. 25, 1868, was intended by the legislature of Kansas to reach the bonds issued before as well as those after its passage.

4. Notice to one of the trustees appointed by the company in its deed mortgaging its property, including the county bonds, to secure the payment of its bonds, issued and negotiated for value to third parties, does not, in a suit by the trustees to enforce the payment of the county bonds, operate to destroy the *bona fide* holding of such parties.

ERROR to the Circuit Court of the United States for the District of Kansas.

This action was commenced by Nathaniel Thayer, F. W. Palfrey, and George W. Weld, to recover the amount due upon interest coupons attached to certain bonds, originally issued, to the amount of $100,000, by the county of Johnson, in the State of Kansas, to the Kansas and Neosho Valley Railroad

Company, in payment of a subscription of like amount made by it to the capital stock of that company. The bonds and coupons, although varying in amounts and in the dates of payment of the several coupons, are in the same form. The following is a copy of one of them : —

" No. 1.]          UNITED STATES OF AMERICA.          [$1,000.

" STATE OF KANSAS.

" *Stock Bond of Johnson County, Kansas.*

" Thirty years after date, Johnson County promises to pay to Kansas and Neosho Valley Railroad Company (a corporation organized and created under a general law of the State of Kansas, by virtue of a certificate of incorporation, filed and recorded in the office of the secretary of the State of Kansas, under date of March the 8th, 1865), or bearer, the sum of $1,000, for value received, with interest at the rate of seven per cent per annum, payable semiannually at the Ninth National Bank in the city of New York, from and after the first day of January, 1867.

" By order of the board of county commissioners of the county of Johnson, State of Kansas.

" OLATHE, KANSAS, Sept. 3, 1866.
                              " D. M. WILLIAMS,
                    " *Chairman Board County Commissioners, Johnson County.*
" [L. S.]     Attest: F. E. HENDERSON, *Clerk.*"

" *Coupon.*

                              " OLATHE, KANSAS, Sept. 6, 1867.

" Treasurer Johnson County will pay to bearer thirty-five dollars in the city of New York, being semiannual interest due on the first day of January, 1872, on the bond of the county of Johnson, No. 1, to the Kansas and Neosho Valley Railroad Company, issued in pursuance of an order of the county commissioners of said county, dated Sept. 3, 1866.

                              " D. M. WILLIAMS,
                    " *Chairman Johnson County Commissioners.*
" F. E. HENDERSON, *County Clerk.*"

The bonds are indorsed as follows: —

" I, A. Thoman, auditor of the State of Kansas, do hereby certify that this bond has been regularly and legally issued ; that the signatures thereto are genuine ; and that such bond has been duly registered in my office, in accordance with an act of the legislature

entitled 'An act to authorize counties, incorporated cities, and municipal townships to issue bonds for the purpose of building bridges, aiding in the construction of railroads, or other work of internal improvement, and providing for the registration of such bonds, and the repealing of all laws in conflict therewith.' Approved March 2, 1872.

"Witness my hand and official seal this sixteenth day of April, 1872.

"[L. S.]                          A. THOMAN, *Auditor of State.*"

The authority to the county to subscribe was conferred by the first section of c. 12 of the laws of Kansas for the year 1865, which is set out in the opinion of the court. The following proposition was submitted to the electors of the county : —

"Whereas, on the fourteenth day of February, A.D. 1865, an act of the legislature of the State of Kansas took effect and became in full force, entitled, 'An Act to authorize counties and cities to issue bonds to railroad companies;' and whereas, by law, the board of county commissioners are authorized to call a special election of the qualified electors of the county, to determine whether the said board of county commissioners shall subscribe, in the name of the county, to any railroad corporation to construct a road into or through the county ;

"It is therefore ordered, that a special election of the qualified electors of Johnson County be held at the several voting precincts in said county, on the seventh day of November, 1865; that said election shall, in regard to qualifications of electors, and the manner of receiving votes, and the manner of conducting said election, be according to the laws in force governing elections.

"The question submitted to the qualified electors at said election shall be, whether the board of county commissioners shall be authorized to subscribe capital stock in the name and for the benefit of Johnson County, in the sum of $100,000, to aid in the construction of a railroad commencing at or near the Union Depot, on the south side and near the mouth of the Kansas River, and near Kansas City ; thence to Olathe, in Johnson County ; thence, in a southerly direction, through said county to the southern boundary of the State of Kansas ;

"In case a majority of said electors shall vote for subscription to the capital stock of said railroad, the board of county commissioners shall issue the bonds of said county of Johnson, in such

amounts as they may deem best, in payment of said stock: *Provided*, that no part of said bonds shall be issued until work on the said railroad shall be actually commenced in said county, and then only in *pro rata* assessments as the work progresses; *and provided, further*, that the whole of said sum of $100,000 shall be expended within the limits of said county; which said bonds shall bear interest at a rate not exceeding seven per cent per annum, and shall be payable within thirty years.

" The ballots of said election shall be written or printed: 'For subscription to railroad;' 'Against subscription to railroad.' If a majority of all the votes cast at said election be for subscription to railroad, the board of county commissioners shall be authorized to subscribe stock to said railroad in the name and for the benefit of Johnson County, and to issue bonds in the manner heretofore stated. All books shall be kept at the several voting precincts by the judges and clerks of said election, showing the whole number of votes polled for and against said subscription to railroad.

" The votes shall be counted by the judges of said election, and the result proclaimed, and the poll-books signed by the judges and attested by the clerks as nearly in accordance with sects. 18 and 23, p. 459, Stat. of 1862, as may be practicable. After canvassing the votes, the judges shall seal up and return the poll-books to the county clerk on or before the Friday next following said election, and within three days after said election deposit one copy of said poll-books with the township trustee, and shall also preserve the ballots used at said election. Sects. 25 and 26, p. 497, and Code 1862.

" The county clerk and commissioners will meet in Olathe on Friday next following said election, to canvass and declare the result, and make a record thereof.

" *Ordered*, that the foregoing order and notice be published in the 'Olathe Mirror,' twenty days prior to said election.

" DAVID M. WILLIAMS, *Chairman.*

" Attest: F. E. HENDERSON, *County Clerk.*"

A majority of the electors voted at the time named, and in the several precincts of the county, in favor of the subscription; and, on the 3d of September, 1866, the county commissioners made it, and it was accepted by the company.

In April, 1867, a call was made by the board of directors of the company, upon all of their subscribers for stock, for the whole amount unpaid upon their subscriptions.

On the sixth and twenty-seventh days of September, 1867, the county commissioners issued and delivered to the company, in part payment of the county subscription, bonds to the amount of $50,000, which are a part of those in question.

On June 19, 1868, the following contract was entered into between the president of the company and the commissioners of Johnson County, to wit : —

" Know all men by these presents, that we, the Board of County Commissioners of Johnson County, in the State of Kansas, in consideration that the Kansas and Neosho Valley Railroad Company shall construct and put into operation a railroad from a point near Kansas City, Missouri, by way of Olathe, to the southern boundary line of said Johnson County, in the direction of Paola, Kansas, within eight months from this date, and in consideration of one dollar to be paid by said railroad company, we hereby agree and bind ourselves, for and in behalf of said Johnson County, to assign and transfer to said railroad company, or their successors, the $100,000 of stock heretofore voted and subscribed by said Johnson County to the capital stock of said railroad company ; and we do further agree, in consideration of the premises aforesaid, to cause to be issued, without delay, the $50,000 of bonds of the said county remaining unissued and unpaid on the $100,000 of stock, so as aforesaid voted and subscribed, and place said $50,000 of bonds in the hands of J. E. Hayes, who shall hold said bonds as the trustee and agent both of said Johnson County and said railroad company, to be delivered by said J. E. Hayes to said railroad company, or their successors, on their constructing and putting in operation said railroad from said point near Kansas City to Olathe: *Provided*, said railroad shall be constructed and put in operation to Olathe within five months from this date.

" And we further agree, in consideration of the premises aforesaid, that in any election of the stockholders of said railroad company which may be held prior to the transfer of the $100,000 of stock as above provided for, and while said railroad company may be engaged in good faith in performing the conditions upon which such transfer of stock is to be made, that we will cast the votes to which said county may be entitled as a stockholder, in such manner and for such persons as said railroad company, or their successors, may request.

" It is hereby expressly understood, that if said railroad company shall fail to comply with the conditions above mentioned, then this

agreement shall be null and void ; but, if the said company, or their successors, shall fully comply with all of said conditions, then this agreement shall be binding and in full force.

" Witness our hands at Olathe, this nineteenth day of June, A.D. 1868.

" B. F. HOLLENBACK,

" *Chairman Board of County Commissioners.*

" JOHN BRADY, *Associate Commissioner.*"

The county commissioners of Johnson County executed, June 22, 1868, the remaining bonds, to the amount of $50,000, and placed the same " in escrow " with Josiah E. Hayes, to be delivered to said railroad company, upon its compliance with the terms of this contract.

On Oct. 5, 1868, the county commissioners, at the instance of the president of the railroad company, made the following order extending the time for completion of the road to Olathe : —

" Whereas, by mutual agreement, the commissioners of the county of Johnson have granted to the Kansas and Neosho Railroad Valley Company an extension of time, from the nineteenth day of November next to the fifth day of December next, within which to construct their said road to the town of Olathe, according to the provisions, in other respects, of a resolution, ordinance, or agreement passed or entered into on the nineteenth day of June, A.D. 1868, by the said county commissioners, entitling the said railroad company to the bonds and stock of said county voted and subscribed to said company. It is therefore resolved by the commissioners of Johnson County, that, in the event said railroad company shall so construct to the town of Olathe their said road on or before the fifth day of December, in manner prescribed in the resolution, ordinance, or agreement passed June 19, 1868, the trustee or commissioner named therein shall, and is hereby instructed and empowered to, deliver and assign to said railroad company the said stock and remaining bonds of said county as heretofore authorized and instructed, the same in all respects as though the said road had been constructed to the town of Olathe on or before the nineteenth day of November, 1868.

" B. F. HOLLENBACK, *Chairman Board.*

" JOHN BRADY.

" K. COATES, *President Railroad Co.*"

The company completed its road according to the terms of the agreement; and, on the fifteenth day of December, 1868, said Hayes delivered to it the remaining bonds. They were signed by said Hollenback as chairman; but in other respects, except as to said date, are similar to the bond, of which a copy is above given.

On or about March 29, 1869, and before the maturity of any of the coupons in suit, the company, having previously changed its corporate name to "Missouri River, Fort Scott, and Gulf Railroad Company," executed a mortgage or deed of trust, bearing date Jan. 1, 1868, upon its railroad and other property, including the bonds in question, to the plaintiffs as trustees, to secure the payment of five thousand negotiable bonds, of $1,000 each, bearing the same date as the deed of trust, which the company, before the maturity of any of the coupons now in suit, had issued and transferred, for value, to various persons, by whom they are still held.

Immediately after the execution of the deed, the company delivered the county bonds in question to the plaintiffs, who have ever since held them.

All of the coupons for interest that matured prior to those in suit were regularly paid by the county, with funds raised by the levy and collection of a tax for that purpose.

Thayer, one of the plaintiffs, had notice of all the facts connected with the issue of the county bonds; of the agreement of June 19, 1868; of the assessment of the stock by the company, and of its non-payment; and of the issue of stock as a bonus to the purchasers of the bonds of the railroad company, and of the facts connected with the completion of the road to Olathe: but the other plaintiffs had no such notice, nor had the purchasers of the railroad bonds.

The Curative Act, as it is termed, of Feb. 25, 1868, is set forth in the opinion of the court. The action was tried by the court without a jury, and a special finding of facts made. The court found, as a conclusion of law, that the plaintiffs were entitled to recover the amount of the coupons declared on. Judgment was entered accordingly. The defendants sued out this writ of error.

*Mr. Nelson Cobb* for the plaintiffs in error.

*Mr. Wallace Pratt, contra.*

Mr. Justice Hunt delivered the opinion of the court.

The recovery by Thayer and others of the amount of the coupons sued upon is challenged upon various grounds.

1. It is contended that no authority to subscribe for the bonds was conferred by the vote of Nov. 7, 1865, for the reason that no particular railroad was referred to in the vote on that occasion. The question was submitted to the voters of Johnson County, in the form of an inquiry, whether the commissioners should be authorized to subscribe capital stock to the amount of $100,000, to aid in the construction of a railroad commencing at or near the Union Depot, on the south side of and near the mouth of the Kansas River, and near Kansas City; thence to Olathe, Johnson County; thence, in a southerly direction, through said county to the southern boundary of the State of Kansas. Assuming that the road to which the subscription was made met the terms required, it is insisted that the question of subscribing to the particular railroad company by name should have been submitted to the electors, and that there must have been an actual location of the road before the election was held.

We had occasion to consider a question similar to the latter branch of this objection in *County of Callaway* v. *Foster*, 93 U. S. 567, and held that the objection was not a valid one.

In that case the statute authorized a subscription by any county " in which any part of the route of said railroad may be." The road was not built, located, nor organized. The court there intimated that, where this language was used in reference to a road which was yet to be built, it could be applied to any county in which the road might by law be located.

The road to which subscription was in this case made was, in fact, located in the county of Johnson, and the work upon it commenced before any of the bonds were executed or delivered, — was actually built through the county, and is now there operated. We think a previous location of the road was not required by the terms of the statute.

Was it necessary that the particular road to which a subscription was intended to be made should be described in the proposition submitted to the popular vote, or was the general language used in this case a compliance with the law?

The following is the section of the act of Feb. 10, 1865, controlling the question : —

"SECT. 1. That the board of county commissioners of any county to, into, through, from, or near which, whether in this or any other State, any railroad is or may be located, may subscribe to the capital stocks of any such railroad corporation, in the name and for the benefit of such county, not exceeding in amount the sum of $300,000 in any one corporation, and may issue the bonds of such county, in such amounts as they may deem best, in payment for said stocks : *Provided,* that such bonds shall be ussued only in payment of assessments made upon all the stocks of such railroad company, which bonds shall bear interest at a rate not exceeding seven per cent per annum, and shall be payable within thirty years. And the said board of commissioners shall elect one of their number, who shall not be a stockholder, to cast the vote of the county at any election for directors, or at any meeting of the stockholders of such company ; and said board of commissioners shall annually levy and collect, at the same time and in the same manner that general taxes are levied and collected, a tax sufficient to pay the annual interest on such bonds, and to create a sinking fund for their redemption. But no such bonds shall be issued until the question shall be first submitted to a vote of the qualified electors of the county at some general election, or at some special election to be called by the board of county commissioners, by first giving twenty days' notice in some newspaper published and having general circulation in the county; or, in case there be no paper in the county, then by written or printed notices posted up in each election precinct ; and, in submitting said question, said board of commissioners shall direct in what manner the ballots shall be cast. If a majority of the votes cast at such election shall be in favor of issuing such bonds, the board of commissioners of the county shall issue the same."

This language, in relation to the road to which the subscription may be made, is as general as words can make it. The board of commissioners may subscribe to the capital stock of "any railroad" which is or may be located in or near the county they represent, and may issue the bonds of the county in payment for said stocks. "But no such bonds shall be issued until the question shall be first submitted to a vote of the qualified electors of the county." In neither of these clauses is there a qualification that the particular road shall be

named in the submission, or that any detail shall be set forth. The burden of bonds shall not be imposed upon the county except by the previous assent of a majority of the electors. When the burden is assumed by the electors, it is quite reasonable that it should be left to the county board to select the particular corporation in which the stock shall be taken. That trust can be there executed as wisely and judiciously as at a mass meeting of the voters.

The electors here voted to take stock in a corporation to aid in the construction of a road " commencing at or near the Union Depot, on the south side of and near the mouth of the Kansas River, and near Kansas City; thence to Olathe, Johnson County; thence, in a southerly direction, through said county to the south boundary of the State of Kansas."

We think this was a sufficiently specific statement to be submitted to the voters for their approval or disapproval.

We cannot, however, think that this is a vital point, even if there was a defect in this respect. The question of subscribing for the stock and issuing the bonds for a road from the mouth of Kansas River to the south boundary of the State was submitted to the electors of Johnson County. Notice was given for the time required by the statute, and a full and fair vote was taken, so far as we are informed. The approval of the electors by their vote, at a meeting called for that purpose, is the object of the statute. Defects, irregularities, or informalities, which do not affect the result of the vote, do not affect its validity. The defect we are considering, if it is a defect, does not go to the question of jurisdiction, and does not impair the validity of the bonds.

The case of *Lewis* v. *Commissioners of Bourbon County,* 12 Kan. 186, is cited on this point. In that case, four questions were passed upon by the Supreme Court of Kansas: *First,* Was the presentation of a petition, signed by one-fourth of the qualified voters, a condition precedent to the valid action of the commissioners? *Second,* Did the failure to name the corporation in the propositions submitted to the electors avoid the whole proceedings? *Third,* A majority of the votes of the electors having been cast against the proposition to issue bonds, was the county board authorized to issue them? *Fourth,* Did the

subsequent submission, and the proceedings thereon, confer the authority to issue the bonds?

The court held that the first objection was cured by the act of 1868. The second and the third objections were held to be fatal, and that the case was not relieved by the proceedings referred to in the fourth objection.

The court did, in its language, hold that the objection raised in the present case, to wit, that the name of the corporation was not inserted in the proposition for the popular vote, was fatal. Had this been the only or an indispensable part of the decision, we should have been called upon to inquire whether the decision was one of that class of State decisions upon its own statute that was binding upon us. The other question, however, existing and decided in that case, was, in its nature, so exclusive and so controlling that any thing said or professed to be decided beyond it does not require much consideration. The court held that, in the exercise of its general jurisdiction, it had the power to inquire into the number of votes actually cast for and against the proposed issue of bonds; and, upon making such inquiry, it found and determined that, in fact, a majority of the votes cast were cast against the proposition. Upon this point all the decisions of this court, and, so far as we know, of all other courts, concur. If a majority of the electors cast their votes against the proposition to issue bonds, the entire foundation of the proceedings is gone. There is an absolute want of jurisdiction to proceed further in the matter, and an attempt to do so is void, as are all proceedings or issues based upon it. With this elemental failure existing in that case, other and further decisions tending to the same result are not to be regarded as authority.

The Gulf Railroad v. Commissioners of Miami County, 12 id. 234, is based upon the case above referred to, and follows it, without examination or discussion. It does not refer to the Curative Act of Feb. 25, 1868, which was held, in the Bourbon County case, not to be applicable to an election where a majority of votes was cast against the proposition, but which act, it was held, did relieve against the defect of the absence of the preliminary petition required by the statute. The court said that act was intended to sustain, and not to defeat, the will

of the people. This principle would have justified its application in relief of the defect before it, if there was such defect; and its consideration might well have altered the result. Both of these decisions were made after the bonds in this suit had been issued, and the interest upon them regularly paid for a considerable time. The road had been built as promised, the county of Johnson and its people enjoyed the anticipated benefits, and we are of the opinion that we are not bound to follow a decision which releases them from all the corresponding obligations. To this effect are the decisions of this court, made in the years 1865, 1871, and 1872. *Gelpcke et al.* v. *City of Dubuque*, 1 Wall. 175; *Bulls* v. *Muscatine*, 9 id. 571; *Olcott* v. *The Supervisors*, 16 id. 678.

The Curative Act of February, 1868, was intended by the legislature of Kansas to reach cases like the present, and to cover both the bonds issued before, as well as those issued after, its passage. It is as follows: —

"SECTION 1. Whenever a majority of the persons voting at any election called by the board of county commissioners of any county have heretofore voted in favor of subscribing stock and issuing bonds to any railroad company or companies, the board of county commissioners of such county may subscribe to the capital stock of such railroad company or companies to the amount and on the conditions specified in the order of such boards of county commissioners in such cases, and pay such subscription, by issuing to each company bonds of such county at par, payable at a time therein to be fixed, not exceeding thirty years from the date thereof, bearing interest at the rate of seven per cent per annum, with interest coupons attached, whether such orders and elections, or either of them, have been in compliance with the statutes in such cases made and provided or not, or whether the proposition submitted at the election had was for the subscription of stock and the issuance of bonds to one or more railroad companies."

"SECT. 4. The provisions of this act shall be applicable in all cases where the election was held upon the subscription of stock and the issuance of bonds prior to the twenty-first day of January, A.D. 1868.

In the language before quoted, this act was intended to aid, and not to destroy, the proceedings in subscribing for stock

and issuing bonds. In this case, the election was held prior to the twenty-first day of January, 1868; and, although a portion of the bonds had been issued prior to the passage of the act, we are of the opinion that they are within its protection. It was intended to reach cases where the majority of the electors had voted in favor of issuing the bonds, "whether such orders and elections, or either of them, have been in compliance with the statutes in such cases made and provided or not."

It is contended, again, that, by an agreement made on the 19th of June, 1868, the stock of the county in the company was cancelled, and that, therefore, there was no consideration for the sale of the bonds.

By the agreement referred to, the county undertook to deliver to the road the $50,000 bonds, yet unissued, to sell and deliver its interest in the capital stock of the company, and in the mean time to cause its stock to be voted upon, as the company should direct, provided that the road should be built and completed to the southern boundary of Johnson County within eight months, and to the town of Olathe within five months, from date, the bonds to be issued, and placed in the hands of a depositary, to be delivered upon the performance of the agreement.

A completion of the road at an earlier period than was required (no time being specified in the original proposition), and at a probable increase of expense, seems to afford a good consideration for any lawful agreement on the part of the county. We fail to discern the force of this objection, or of the point connected with it, that the stock became thereby cancelled. The commissioners had authority to sell the stock, Compiled Laws of Kansas, 1862, 409; and, unless prohibited by law, an incorporation may become the holder of a portion of its own shares. *City Bank* v. *Bruce*, 17 N. Y. 507.

We do not regard the circumstance that the road was located and built a fraction of a mile distant from the town of Olathe as of any importance. It was a practical compliance with the requisition in that respect, and was accepted and received by the county as a satisfactory performance of the contract. The bonds were issued after the location, and the interest was paid from time to time without objection or complaint in that re-

spect. It is too late now to set up an objection which is an evident afterthought.

It is contended, further, that there is no *bona fide* holding of these bonds, and that all defences may have their full effect in this case.

" The court below finds that the plaintiff Thayer had notice of all the facts and circumstances connected with the issue of these bonds by Johnson County, and of the agreement of June 19, 1868, and of the facts with regard to the assessment of the stock by the railroad company and of its non-payment, and of the issue of stock as a bonus to the purchasers of the bonds of the railroad company, and of the facts with regard to the completion of the road to the town of Olathe; but his co-trustees had no such notice, nor did the purchasers of the first mortgage bonds have such notice, except so far as they are charged with constructive notice by reason of the knowledge of 'Thayer, one of the trustees."

It is a part of the case, that, on the first day of January, 1869, the railroad company executed to Nathaniel Thayer, F. W. Palfrey, and George W. Weld, the plaintiffs in this suit, a deed of trust conveying a large quantity of lands, and transferring, among other things, its subscriptions from towns and counties, including that now in suit, to secure the payment of $5,000,000 of its negotiable bonds to be issued by the said company, as therein particularly described; that, before the coupons now sued upon had become payable, the railroad company had issued those bonds, which are now outstanding and unpaid to the full amount thereof.

The question then arises, whether notice to one of the trustees in this deed of trust is notice to the holders of the mortgage bonds in such manner that, in a suit by the trustees to enforce payment of the county bonds, the character of a *bona fide* holder without notice is lost.

In *Curtis and Others* v. *Leavitt*, 15 N. Y. 194, the court say : —

" If Graham, one of the trustees, was chargeable, as director of the company, with knowledge that there had been no previous resolution, notice to him was not notice to his *cestuis que trust.* He did not stand to them in the relation of an agent. He was selected and appointed as a trustee by the company, not by the *cestuis que trust.*

His powers and duties were prescribed by the company, not by the bondholders. There were, at the time of the execution of the trust-deeds, no bondholders, no *cestuis que trust.* It is a necessary attribute of an agency that it should be created by the principal. . . . In this case, as the relation of principal and agent did not exist between the bondholders and Graham, notice to him, or knowledge by him, that there was no previous resolution, was not constructive notice to the bondholders."

And, again, on the page following, it is said : —

" The trustees are not to be regarded as the agents of the purchasers of the bonds and mortgages assigned to them. No consideration proceeds from them. They were mere assignees of those securities, coupled with no interest, in trust to hold them as security for the payment of all the mortgage bonds that should thereafter be sold or negotiated by the company. . . . Whoever purchased the mortgage bonds became purchasers of the bonds and mortgages so assigned as security for their payment, or of an equitable right to hold them as such security."

We think this is sound doctrine, and that it establishes the proposition that notice to Thayer did not operate to destroy the *bona fide* holding of the bondholders under the deed of trust in which he was named as one of the trustees.

We have noticed all of the objections which we deem of importance, and are of the opinion, upon the whole case, that the judgment should be affirmed ; and it is     *So ordered.*