## MONTANA TONOPAH MINING CO. v. DUNLAP.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1912.)

### No. 2,030.

1. **APPEAL AND ERROR (§ 1001\*)—REVIEW—SCOPE OF INQUIRY.**

On a writ of error to review a judgment entered on the verdict of a jury, if there is any substantial evidence to support the verdict, it is sufficient, the determination of the weight to which it is entitled not being within the province of the appellate court, which is confined to a consideration of exceptions, to the admission or rejection of evidence, and to the charge of the court and its refusal to charge.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934; Dec. Dig. § 1001.\*]

2. **EVIDENCE (§ 213\*)—ADMISSIONS—FACTS RECITED IN OFFER TO COMPROMISE.**

A resolution adopted by the board of directors of a corporation reciting that an officer of the corporation had in the past performed certain services outside of the duties of his office for which he was entitled to compensation is competent evidence in a subsequent suit by the officer to recover for such services as an admission of fact by the corporation, although the resolution was passed in an effort to compromise the claim.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 745–751, 753; Dec. Dig. § 213.\*]

3. **CORPORATIONS (§ 308\*)—OFFICERS—RIGHT TO COMPENSATION FOR NONOFFICIAL SERVICES.**

An officer or director of a corporation may recover fair and reasonable compensation for services rendered for the corporation outside the scope of his official duties, although there was no express contract therefor, if the services were rendered under such circumstances as to raise the fair presumption that the parties intended and understood that they were to be paid for.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. § 308.\*]

4. **LIMITATION OF ACTIONS (§ 65\*)—WHEN STATUTE BEGINS TO RUN—CONDITION PRECEDENT TO LIABILITY.**

Where a corporation promised to pay for extra nonofficial services rendered by an officer as soon as it should be out of debt, limitation did not

---
\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

begin to run against an action to recover for such services until the happening of that event.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 261, 345–350; Dec. Dig. § 65.*]

In Error to the Circuit Court of the United States for the District of Nevada.

Action at law by R. P. Dunlap against the Montana Tonopah Mining Company. Judgment (192 Fed. 714) for plaintiff, and defendant brings error. Affirmed.

The defendant in error was plaintiff in the court below, where he brought the action to recover the value of services claimed to have been rendered by him for the defendant during a period of about seven years at Tonopah, Nev. During that period he was officially connected with the company, first, as secretary and treasurer at a fixed salary which was regularly paid him, next as a director, and then as vice president of the corporation. From January, 1903, to October 15, 1903, he was secretary and treasurer at a salary of $150 a month, which salary was increased to $200 a month for the period extending from October 15, 1903, to February 2, 1905, at which time he resigned the office of secretary and treasurer. From September, 1903, to February 15, 1910, he was one of the directors of the company, and from September 11, 1906, to February 15, 1910, was its vice president. On the last-mentioned day he resigned as director and vice president of the company, and on the 26th of the same month commenced the present action, alleging in his complaint that from about January, 1903, to about February 15, 1910, the plaintiff was engaged in the service of the defendant, and rendered it services at its request for which the defendant agreed to pay the plaintiff whenever it was out of debt, and that on February 15, 1910, the defendant was out of debt, and had a large amount of surplus funds in its treasury; that the reasonable value of the services so rendered by the plaintiff was the sum of $24,-900, no part of which has been paid except the sum of $3,900 paid the plaintiff prior to January, 1905, and $500 which was subsequently paid him, leaving a balance of $20,500 still due from the defendant to the plaintiff, for which he prayed judgment, with costs.

By its answer and amended answer the defendant company set up the facts respecting the holding by the plaintiff of the offices of secretary and treasurer and director and vice president, the fixed salary of the office of secretary and treasurer during the time the plaintiff held it, and the full payment of such salary by the company, the duration of time that plaintiff held the office of director and vice president, to which it was alleged and proved no compensation was attached, and the answer then alleged that the plaintiff never performed any services for or on behalf of the defendant company except such as were incidental to the offices he at the time held, and that there was nothing owing from the defendant to the plaintiff. By a further amended answer the defendant pleaded the statute of limitations against the claim of the plaintiff for any services rendered prior to a date four years before the commencement of the action.

The case was tried before the court with a jury, which returned a verdict in the plaintiff's favor for $7,500, for which, with costs, judgment was entered against the defendant company, which brings the case here on writ of error.

Rufus C. Thayer, of San Francisco, Cal., for plaintiff in error.
McIntosh & Cooke, of Tonopah, Nev., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] Upon a careful examination of the record, we find in the evidence sufficient to support the verdict of the jury, for, this being a writ of error, the

---

rule is that, if there be any substantial evidence tending to support the verdict, it is enough, the proper weight to be given to the evidence not being within our province, which is confined to a consideration of exceptions to admission or rejection of evidence, and to the charge of the court and its refusal to charge.    New York, L. E. & W. R. Co. v. Winter's Administrator, 143 U. S. 60, 75, 12 Sup. Ct. 356, 36 L. Ed. 71.    What the plaintiff claimed and gave testimony tending to support was that the services for the value of which he sued were beyond the scope of his duties as secretary and treasurer, director, or vice president, and that they were neither volunteered nor gratuitous, but were rendered at the express request of the president and manager of the company, and that both he and the company understood and expected that they were to be paid for.    It is true that there was evidence tending to negative all of those matters, but there was some tending to sustain them.    For instance, the plaintiff testified, among other things:    That during the year 1903, in addition to his duties as secretary and treasurer he stopped on two occasions at Reno, under the instructions of the president and general manager of the company, "to check up the patent survey notes with the Surveyor General, and after they were in shape brought them to Carson City, and made an abstract of title of every bit of property that the company owned, wrote every deed in my own handwriting, copied them from the records, brought them to Carson City, presented them to the Land Office, and got my order for publication, proceeded to Tonopah and put the matter through publication, and carried on the correspondence that was necessary and incident thereto; came to Carson City on the 21st day of December, 1903, and made the final payment to the Land Office, and forwarded the papers to our attorney in Washington, Horace F. Clarke, who had charge of the patent proceedings for that end of the line."    That in March, 1904, an accident occurred in the mine resulting in the death of one Mitchell; that he was called to the mine, and arrived there, according to the testimony of the witness, "just as the body was hoisted to the surface, and it was put into the wagon that I had taken up there for the purpose.    I drove to the undertaking establishment and turned the body over, and then proceeded to the house of the widow, in company with Mr. Lynch, one of the directors, and there proceeded to relieve the immediate needs and distress of the family by giving them a certain sum of money, $100, that I got from Mr. Lynch for the purpose, which was afterwards repaid.    I had charge of the coroner's inquest the next night.    We had no attorney in Tonopah at the time; Dixon, Ellis & Ellis of Salt Lake being our attorneys. I conducted the examination of the witnesses before the coroner's jury, and obtained a verdict of absolute exoneration from responsibility by the jury.    I advised the liability company in which we were carrying liability insurance, received word from them by wire later to the effect that they denied absolutely any responsibility or liability, conferred with Mr. A. C. Ellis, Jr., the vice president, by letter and wire in regard to the matter, proceeded to negotiate with the family of the deceased, and finally succeeded in making a complete settlement with them, getting a receipt therefor for $1,250, and drew up the papers in

settlement myself. As I said, we had no attorney, no local attorney in Tonopah, and, after strenuous correspondence with the San Francisco office of the liability company, induced them to reimburse the Montana Tonopah Mining Company in the amount of $1,250, which I had paid to the widow."

Further quoting from the testimony of the plaintiff, he said that in the early summer of 1904 "a party came to me and advised me of the fact that there was a scheme on foot to throw the Montana Tonopah Mining Company in the hands of a receiver by a certain stockbroker by the name of Barton Pittman with offices in Tonopah, who had as his associates in the plan New York and Philadelphia brokers. The plan was for Pittman to place 500 shares of our stock in the name of Dan W. Edwards, with instructions for him to come to my office, and demand of me in such a way that I would refuse it, the privilege to inspect the mine, and also inspect the books of the company; and having refused a stockholder that privilege, the papers were already drawn, and a team hired by Mr. Pittman, preparatory to a trip to Belmont, then the county seat, where he would make application to have a— I frustrated the plan by, instead of refusing Mr. Pittman privilege to examine the mine, I arranged for him to examine it. This he did not do. I declined to allow him to examine the books for a financial statement until I could get the consent of the directors, simply for the purpose of saving time, and getting time. That would not suit his plans, however. He said it would take too long, and it would be the 15th of the next month. This was about the 20th of that month, and the scheme fell through on that ground."

The plaintiff further testified that upon the acceptance of his resignation on the 2d of February, 1905, the board of directors of the company adopted this resolution, which was introduced in evidence from the minutes of the company:

"Whereas, R. P. Dunlap has tendered his resignation as secretary and treasurer of this company,

"Be it resolved, that the acceptance of this resignation is with sincere regret in losing the valuable services of an officer who has for the past two years shown such zealous interest in its affairs, and whose most able and efficient performance of the peculiarly difficult duties that have devolved upon him at various times, has earned for him the warmest appreciation of the board and stockholders, particularly in his careful, conscientious, and always satisfactory management of the entire business of the company in addition to the affairs of his own office, during occasional and enforced absences of General Manager Knox, and for his energetic and expeditious services in attention to matters connected with securing patent for the company's mines.

"During the past year we have had one serious accident in the mine which might have resulted in the commencement of a damage suit against the company, notwithstanding the fact that the coroner's jury exonerated the company from responsibility, but for the just and equitable adjustment effected entirely through the good offices of Mr. Dunlap, who forced the liability company in which we were insured to make a satisfactory settlement with the family of John Mitchell.

"We feel that Mr. Dunlap is entitled to the gratitude not only of our own stockholders, but to the gratitude of all persons interested in the development of this district, for blocking certain scheming stockbrokers, whose attempted manipulations of Montana-Tonopah stock by gross misrepresentation and in furtherance of a deeply laid plot, which, if successful, would have practically confiscated half the value of the stock to these brokers.

"We are especially pleased. and gratified that Mr. Dunlap remains on the board of directors, where we may continue to enjoy the benefit.of his wise counsel, which has been such a material factor always, and has contributed in such marked manner to the success of the company."

The plaintiff also testified, among other things, that, after he ceased to be secretary and treasurer, he "was always at the call of the superintendent and the secretary, and was consulting with them at all times in regard to the welfare and the general policy of the company, and nearly every day and every week"; that they consulted with him "about the bank balances, pay rolls, remittances, general financial status, but never with regard to mining development"; that in 1907 he made a settlement with one Alex Ursin and a man named Jock, who had been injured in the transformer house of the mine, and made a satisfactory settlement with the parents of Samuel Merton, who had been killed on a cage; that, in respect to Ursin and Jock, "the negotiations extended over quite a period of time. As often as I saw these boys after they were able to get out of the hospital, I talked the matter over with them, and planned for them to come to my office and make a settlement when they felt like they wanted to do it, and on this day I found them in a receptive mood, and got their attorney, and I made the settlement, paid one of them $1,100, and the other $750, as I remember it; gave one of them a job, and offered the other one a job as soon as he wanted it, and he declined it;" that each of those parties claimed from the company $15,000, and that the papers had already been prepared to be filed in court, but were not filed; that in the same year, 1907, there was another accident in the mine by which Merton was killed, "and," said the witness, "I went to the house of his parents and conferred with them, and finally got them to agree to accept in full, as our voucher will show, the amount necessary to pay the funeral and burial expenses."

The plaintiff further testified as follows:

"In the year 1907 we were just finishing the mill for which we had contracted this enormous debt we have spoken of so much, and it was listed for assessment on the basis of one hundred thousand dollars, and they started to run the 22d day of September. On the first Monday or second Monday, whichever it is, that the board of county commissioners sits as a board of equalization, I appeared before them, and took the matter up with them on the basis of the fact that this was not a completed mill, and it was not in a position to perform the duties for which it was planned, it could not work the ore for the year it was taxed, and it was only possible for it to work three months, if that much. On that basis I succeeded in having the assessment cut down from $100,000, which would have been for the full year, to $25,000, one-fourth of the year. On that basis of tax rate, $1.45 on the hundred, I effected a saving of $2,587.50 in taxes. * * * And at the same time I effected a reduction in the assessed valuation of the surface improvements of $5,875, at the same rate, the full value of which can hardly be appreciated by that mere statement, because it established a lower valuation for succeeding years than had been in effect before."

There was other testimony tending to support the plaintiff's claim that he had rendered services for the company beyond the scope of the duties of the offices which he held, but enough has been stated to show that the contention on behalf of the plaintiff in error to the effect that there was no evidence to justify the verdict cannot be sustained.

[2] The record shows that at a meeting of the directors of the company held on the 15th day of February, 1910, the plaintiff made a demand for compensation for the services claimed to have been rendered by him outside of his official duties during the seven years referred to, and, upon the board refusing the demand, he tendered his resignation as director and vice president, which was thereupon accepted. At that meeting the plaintiff made a statement in writing of his claims and the board of directors adopted a resolution, portions of which were admitted in evidence, over the objections and exceptions of the defendant. The portions so admitted in evidence are as follows:

"Whereas, at times during the past five years it has been necessary to call upon Vice President Dunlap to perform in cases of emergency duties other than those usually designated as the duties of vice president, such as the exercise of his good offices in behalf of the company in case of accident to employés of this company, more particularly in the case of John Mitchell, S. Merton, and others; his efforts in behalf of the company in securing a reduction of taxes on the properties of this company, more particularly the taxes for the year 1907, when the tax against the mill was $3,450, which through Mr. Dunlap's efforts was reduced (to) $862.50, thereby effecting a saving of $2,587.50, and at the same time a reduction of $5.875 in the assessed valuation of the surface improvements, resulting in a saving of $202.88, and the separate listing of the railroad spur, effecting a saving of $78.09, it is the sense of this board that Mr. Dunlap is entitled to some compensation for the services rendered in these matters."

Objection was made to the introduction in evidence of the above-recited portions of the resolution of February 15, 1910, on the ground that the resolution was adopted at a meeting of the board of directors held subsequent to the time of the rendition of the services sued for, and was not binding upon the corporation, that the recognition of the plaintiff's rights thereby made was without consideration and void, and on the further ground that it was an offer to compromise the plaintiff's demand and as such inadmissible. The court overruled the objections, to which the defendant reserved an exception.

The portions of the resolution of February 15, 1910, so admitted in evidence, were in line with the resolution of the same board adopted February 2, 1905, to the introduction of which no objection was made. Both tended to show an admission by the board of directors of the fact contended for by the plaintiff that he rendered services for the corporation outside of his duties as one of its officers, for which he was entitled to some compensation. "The admission of any distinct fact made eo animo is competent, though made in the course of a proceeding for compromise." 2 Chamberlayne on Evidence, §§ 1452, 1454; 2 Wigmore on Evidence, § 1061, and authorities there cited.

Various other objections and exceptions were made and taken in the matter of the admission and rejection of evidence, but in none of them do we find sufficient cause to reverse the judgment.

The plaintiff also testified, among other things, that the president and general manager of the defendant company, Mr. Knox, told him at various times that the services for which he sued would be paid for by the company when it got out of debt. That testimony was put in issue by Knox, and there are a number of circumstances which

might well be considered to corroborate the latter's testimony in that regard; but they need not be gone into for the reason that all such matters were for the consideration of the jury under appropriate instructions.

Looking at the charge of the court, we find no valid objection taken to it by the defendant, although it did reserve an exception to the refusal of the court to give certain requested instructions. The record shows the following proceedings upon the conclusion of the court's charge:

"The Court: Now, gentlemen, have you any exceptions you wish to take?

"Mr. Summerfield: If the court pleases, I am satisfied with the instructions as given.

"Mr. Thayer: Your honor, there is one instruction, or a portion of the instruction, in which reference is made to a recital of the minutes of February 15, 1910, as to the character of that testimony. I could not hear what your honor said.

"The Court: Well, I don't know that I can repeat exactly what I did say; but I said the fact that that occurrence was subsequent to the performance of these alleged services could not detract from its efficiency as an admission of fact; that is, as an admission that these services recited in the resolution itself were, in the opinion of the board at the time, nonofficial duties, outside of and beyond the scope of Mr. Dunlap's duty as secretary and treasurer, or as director and vice president. And I think there was also a statement to the effect that it could not detract from that as an admission on the part of those directors present that at that time they believed the services were not gratuitous.

"Mr. Thayer: That is what I understood at the time of the adoption of the resolution.

"The Court: At the time of the adoption of the resolution.

"Mr. Thayer: And there was another reference to services of one employed as the agent of a corporation as fixing the line of performance of duties outside of the official duties.

"The Court: Well, perhaps I had better state what I mean, instead of reading the instruction over again. I meant by that simply this: That whatever services are rendered by a director or a vice president, within the line of his official duty, or which are necessary in the performance of his official duty, or which are incidental to the performance of his official duty, must be regarded as rendered gratuitously, and he cannot recover for them without an express contract entered into before the services were rendered; but for such services as are not required of an officer, either by law or by any by-laws of the corporation, or by any rule of the corporation, and which can be performed by an agent or by a servant or by an attorney, who need not be a director and who is not a director, these may be considered as nonofficial duties, and as duties beyond the scope of the employment of the officer.

"Mr. Thayer: And can be recovered for, did your honor state that?

"The Court: No; they can be recovered for under the conditions given in the other instructions. This instruction was not followed by any statement that they could be recovered for. They were simply defined as being extra-official or nonofficial duties.

"Mr. Thayer: Perhaps I am overnice about the wording, but I would like the benefit of an exception to that instruction.

"The Court: Please give your reason.

"Mr. Thayer: For the reason it does not correctly state the law, as I understand it.

"The Court: Well, the purpose for which these exceptions are asked before the jury goes out is in order that counsel may put their finger precisely on the point they object to and explain it to the court, so, if it is error, the court can correct it. Now, if you simply say these instructions are all contrary to the law, you may be right, but I don't know in what respect. If you will indicate just in what regard the instruction is wrong, I will correct it, if I think proper.

"Mr. Thayer: Well, along the line that was developed in the argument before the jury came in, whether or not the services rendered by a person who happens at that time to occupy an office in a corporation are without the scope of his official activities he cannot recover therefor, unless the corporation itself had actual knowledge that he intended to claim compensation, and that the corporation intended to pay him. I think that was fully discussed, and the exception was asked merely to cover that.

"The Court: Very well, that may be given as the exception. I have stated my views on that in the other instruction, and I think I have stated them three or four different times. I have read nearly every instruction you offered on that point, and made some comments. Some of them I have given precisely as you offered them. Instructions 1, 2, 4, 6, 7, 8, 10, 11, 12, 13, and 18 have been refused. Some of them because they did not correctly express the law in my opinion, and others because I had already given an expression of the same principle in my instructions.

"Mr. Thayer: For the purposes of the record, may I have a general exception to the refusal of the instructions which were not granted?

"The Court: To the instructions I have enumerated, those are the only ones I am aware that I have refused, those I have numbered.

"Mr. Thayer: The exception is taken to the refusal of the court to grant such of the defendant's instructions asked for as were declined.

"The Court: To those instructions?

"Mr. Thayer: Yes."

[3] Notwithstanding the fact that there was no definite and valid exception to the charge of the court, we have nevertheless examined the charge, and find that it contains a full and fair statement of the law applicable to the case as presented by the evidence. It is in accordance with the decisions of the Supreme Court upon the subject, and with the great weight of authority in this country. In the case of Fitzgerald Construction Company v. Fitzgerald, 137 U. S. 98, 111, 11 Sup. Ct. 36, 41 (34 L. Ed. 608), the court approved the following statement of the general rule:

"A bank or other corporation may be bound by an implied contract in the same manner as an individual may. But in any case, the mere fact that valuable services are rendered for the benefit of a party does not make him liable upon an implied promise to pay for them. It often happens that persons render services for others which all parties understand to be gratuitous. Thus directors of banks and of many other corporations usually receive no compensation. In such cases, however valuable the services may be, the law does not raise an implied contract to pay by the party who receives the benefit of them. To render such a party liable as a debtor under an implied promise, it must be shown, not only that the services were valuable, but also that they were rendered under such circumstances as to raise the fair presumption that the parties intended and understood that they were to be paid for; or, at least, that the circumstances were such that a reasonable man, in the same situation with the person who receives and is benefited by them, would and ought to understand that compensation was to be paid for them."

In the case of National Loan & Investment Company v. Rockland Company, 94 Fed. 335, 338, 36 C. C. A. 370, 373, the Court of Appeals for the Eighth Circuit had before it the fundamental question here involved, and summed up its conclusions in respect to it as follows:

"A thoughtful and deliberate consideration of this entire question, and an extended consideration of the authorities upon it, has led to the conclusion that this is the true rule: Officers of a corporation, who are also directors, and who, without any agreement, express or implied, with the corporation or its owners, or their representatives, have voluntarily rendered their services, can recover no back pay or compensation therefor; and it is beyond the

powers of the board of directors, after such services are rendered, to pay for them out of the funds of the corporation, or to create a debt of the corporation on account of them. Jones v. Morrison, 31 Minn. 140, 147, 16 N. W. 854; Blue v. Bank, 145 Ind. 518, 522, 43 N. E. 655; Doe v. Transportation Co. [C. C.] 78 Fed. 62, 67; Association v. Stonemetz, 29 Pa. 534; Railroad Co. v. Ketchum, 27 Conn. 170; Road Co. v. Branegan, 40 Ind. 361, 364. But such officers who have rendered their services under an agreement, either express or implied, with the corporation, its owners or representatives, that they shall receive reasonable, but indefinite, compensation therefor, may recover as much as their services are worth; and it is not beyond the powers of the board of directors to fix and pay reasonable salaries to them after they have discharged the duties of their offices. Missouri River Co. v. Richards, 8 Kan. 101; Rogers v. Railway Co., 22 Minn. 25, 27; Railroad Co. v. Tiernan, 37 Kan. 606, 15 Pac. 544, 553; Stewart v. Railroad Co. [C. C.] 41 Fed. 736, 739; Rosborough v. Canal Co., 22 Cal. 557, 562."

See, also, Corinne Mill, Canal & Stock Co. v. Toponce, 152 U. S. 405, 14 Sup. Ct. 632, 38 L. Ed. 493; Clark & Marshall on Private Corporations, § 671c, p. 2053; 2 Cook on Corporations (6th Ed.) § 657, p. 1929 et seq., and the numerous cases there cited.

[4] The plea of the statute of limitations is unavailing, first, because the plaintiff's evidence was to the effect that the understanding of the parties was that compensation for his services was not to be made until the defendant company was out of debt, and that the action was seasonably commenced after the happening of that event (see Cooper v. Colson, 66 N. J. Eq. 328, 58 Atl. 337, 105 Am. St. Rep. 660, 1 Ann. Cas. 997; Wood on Limitations, p. 166); and, secondly, because it was not claimed by the defendant that any certain time was fixed for the ending of the services or for the payment therefor, and could not have been, since the company denied that it was ever liable for such services.

The judgment is affirmed.