**VAUGHT et al. v. CHARLESTON NAT. BANK.**

**No. 704.**

Circuit Court of Appeals, Tenth Circuit.

Jan. 5, 1933.

Raymond R. Ryan, of Albuquerque, N. M., for appellants.

Merritt C. Mechem, of Albuquerque, N. M. (Henry G. Coors and D. A. MacPherson, Jr., both of Albuquerque, N. M., on the brief), for appellee.

Before LEWIS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

McDERMOTT, Circuit Judge.

The Receivers of The White Pine Lumber Company appeal from the allowance of a claim for $6,344.81, based on the corporation's negotiable note payable to W. A. Mac-Corkle, its President, and signed by Frank H. Porter, its Treasurer and General Manager. The note was endorsed in blank by Mac-Corkle and delivered to the appellee (then the Kanawha National Bank) before maturity, as collateral security for any indebtedness owing by MacCorkle or his son to either the bank or to one McCabe, trustee of the funds of the Charleston Shrine, and an officer of the bank. At the time of the pledge, MacCorkle's son was indebted to the bank, but that indebtedness was paid before this action was brought. MacCorkle and his son then were, and still are, indebted to McCabe for more than the amount of the note. The defenses are that Porter had no authority to sign the note, and that it was executed without consideration and in fraud upon the corporation. Appellee joined issue upon both grounds,

and further claims the protection afforded a bona fide purchaser for value. The appeal brings before us the question of whether the evidence supports the findings of the trial court on these issues.

■ First as to the authority of Porter. From its inception, the control of the corporation was vested in the Porter and MacCorkle families, both of Charleston, West Virginia. Frank H. Porter was elected Treasurer and General Manager of the corporation at its first meeting and was granted "full power and authority to take general charge of the affairs of this company and to conduct the business of the Company in accordance with the Charter and By-Laws of the Corporation." His salary was fixed at $12,000 per annum. At the same meeting a resolution was passed "That ―――― the said Treasurer or President is authorized to sign, endorse, accept, make, execute and deliver any and all checks, notes, drafts and bills of exchange." Porter was then, and when this note was executed, "the said Treasurer." Porter signed 58 notes, of a face value of $502,612.48, pursuant to such authority, 16 of which were original notes signed after the one in controversy. The directors knew he was signing corporate notes, and all of them were recognized as corporate obligations, except the one in suit. They repeatedly told Porter that they must depend upon him to look after the corporate business, that he was in full charge. No officer, director or stockholder has disputed the corporate obligation to MacCorkle, or the authority of Porter to execute the note therefor. We conclude that the record abundantly sustains the trial court's finding that Porter had both actual and ostensible authority to execute the note in suit.

■ Appellants contend that Porter was not the Treasurer of the corporation when he signed the note, because his resignation was then in escrow. His resignation was not accepted until the terms of the escrow were fulfilled, on December 3, 1929, and his successor as Treasurer, but not as General Manager, was elected on that day. A written instrument placed in escrow is not effective until the condition of the escrow is performed. County of Calhoun v. American Emigrant Co., 93 U. S. 124, 127, 23 L. Ed. 826. Porter was therefore Treasurer, as well as General Manager, when the note was executed.

■ Appellants then argue that, in any event, Porter had no authority to deliver the note after December 3rd. The note was executed on November 18, 1929, and remained in the manual custody of Porter until December 6th, when he mailed it to MacCorkle. Porter's resignation as Treasurer became effective on December 3rd; on that day he was elected Vice President, and he continued to act as General Manager until his resignation as such was accepted on March 17, 1930. We do not stop to inquire as to his authority after December 3rd to deliver the note executed in November, for the evidence sustains the trial court's finding as to its delivery in November. The circumstances were these:

In September, 1929, one Kaplan, acting for himself and associates, negotiated for the stock control and management of the corporation. These negotiations led up to a written contract, one of the terms of which was that the creditors of the corporation should be paid. An itemized statement of the indebtedness of the corporation was furnished to Kaplan, and included therein is this obligation to MacCorkle. No objection was made to this obligation, but in November Kaplan requested that MacCorkle take a corporation note instead of the cash called for by the contract, to which MacCorkle reluctantly agreed. Kaplan then directed Porter to execute the note in question, and Porter wired MacCorkle that he had executed the note and held it. MacCorkle then wired Porter that "upon the thorough understanding you have in hand White Pine note which is strictly a negotiable note" he consented to the modification of the purchase contract in this respect. On that date, Porter intended immediately to return to Charleston and deliver the note by hand. His trip was delayed from day to day, and on December 6th he mailed it to MacCorkle. Section 27-297, N. M. Comp. Stat. 1929, the Uniform Negotiable Instruments statute, provides that " 'delivery' means transfer of possession, actual or constructive, from one person to another." There is here written evidence of a constructive delivery. Furthermore, the New Mexico statute provides that where a negotiable instrument is in the hands of a holder in due course, a valid delivery is conclusively presumed. Section 27-122, N. M. Comp. Stat. 1929.

■ Upon the defense of lack of consideration and fraud, the trial court found

"That W. A. MacCorkle, now deceased, of Charleston, West Virginia, was a director of said company from its organization to March 17, 1930, and was president of the said company for about three years prior to December 3, 1929, upon which last said date he resigned as such president; that for two or two and one-half years prior to September,

1929, said W. A. MacCorkle rendered to and for the benefit of the company many valuable services not within the scope of his ordinary duties as president and outside of the duties imposed upon him by virtue of his office as president, and that such services were performed by him with the knowledge of and at the request of the general manager, Frank H. Porter, and with the acquiescence of the directors and officers of the company, for which services MacCorkle had a right to expect reasonable compensation; that said services so rendered by MacCorkle to and for the great benefit of the company were reasonably worth the sum of six thousand dollars."

MacCorkle was paid no salary for his services as President and Director, as such. He was a lawyer who lived in Charleston, West Virginia, but was not the general attorney for the company. The properties and home office of the corporation were in New Mexico. It appears without dispute that in the years 1927, 1928, and 1929, MacCorkle spent a considerable part of his time in endeavoring to extricate the company from the financial mire in which it found itself. He negotiated loans for the company in Cincinnati, in Richmond, and in Charleston; but in order to do this he was required to, and did, pledge his personal credit for upwards of $100,000. He conducted negotiations for the sale of the properties in Detroit and New York City. These efforts were expended in an endeavor to protect the stockholders, of which he was one, and the creditors, of which he became one. His actual outlay for traveling and telegraphic expense was $334.81. The testimony is:

"He continued working from the spring of 1927 until the fall of 1929, in aiding in any way, running all over the country, negotiating, trying to make sales, trying to get them interested in the purchase of the company, getting renewals of these notes in Richmond, Cincinnati, Charleston, using his influence personally to keep these banks from pressing us, I cannot begin to enumerate, he was working for the company all the time. The work of which I am speaking in securing the renewal of notes at various banks is part of it. If the company became insolvent, Governor MacCorkle would probably be liable as endorser on these notes, if the company didn't bring enough to pay them out. The other services by Governor MacCorkle forming the basis of this charge in his favor is his advice, and negotiating with the lumber companies with a view of making a sale of The White Pine Lumber Company to them, getting them interested to come into the company, working with Mr. Kaplan on the trackage right we sold to Mr. Kaplan, the final deal with Mr. Kaplan."

Except for the note in suit, he received no compensation for any of these extraordinary services. When negotiations were under way to sell the properties to Kaplan, MacCorkle agreed with Porter upon payment of $6,000 in full compensation for all of his services, which agreement was reported to Kaplan, the proposing purchaser, and Kaplan accepted it as a corporate obligation. At that time the amount was entered on the books of the company. The directors were advised of the services MacCorkle was rendering, and of the agreement for compensation therefor, and informally approved.

The by-laws of the corporation provide that the directors of the corporation shall receive no stated salary for their services, but "nothing herein contained shall be construed to preclude any Director from serving the Company in any other capacity and receiving compensation therefor." The official duties of the President are those usually prescribed in by-laws, and that he shall have general and active management of the business of the company. This clause must be construed in the light of the other facts. MacCorkle was a lawyer living in West Virginia, and drew no salary as President. The business and offices of the company were in New Mexico, and broad powers of general management were conferred upon Porter, accompanied by an adequate salary. Under such circumstances, the managerial duties of the President must be construed to be those of general supervision only.

The undisputed evidence shows that MacCorkle performed many valuable services for the benefit of the corporation, over and above those which might fairly be expected from the President of a corporation serving without salary. There is no evidence whatever to support the charge of fraud. On the contrary, all the evidence leads directly to the conclusion that the entire transaction was carried out in the utmost good faith. The reputation of those concerned in the immediate transaction is unimpeachable. Although the charge did not then appear upon the books, the proposing purchaser was advised that such a claim existed, and the amount thereof. The negotiations leading up to the acceptance of the note were carried on by telegrams, and they disclose that Governor MacCorkle's primary object was to see that the other creditors of the corporation were

satisfied. The record of time spent and results accomplished amply sustains the trial court's finding that the allowance was reasonable in amount. There is nothing whatever in the record to sustain even an inference of actual fraud.

Appellants contend, however, that an officer of a corporation may not be paid for his services, as such, without an antecedent agreement therefor. But we are not dealing with the question of compensation for the usual services of a corporate officer. We are dealing with services performed which are over and above those which might reasonably be expected of an officer as such. While there is much literature on the subject of the compensation of corporate officers, the rules applicable thereto are traceable to two principles of the law of agency and of fiduciaries. One may not recover for services rendered to another unless there is an express or implied agreement to pay therefor; but if valuable services are rendered another, at his request or with his acquiescence, an implied obligation to pay therefor arises, unless there are circumstances, such as a family relationship, which repel the implication. Mechem on Agency (2d Ed.) §§ 1516, 1518. Where one accepts a position as director or officer of a corporation, without a prior agreement as to compensation, the fiduciary relationship repels the implication that services rendered in such capacity are to be paid for. Thompson on Corporations, § 1842; Fitzgerald Const. Co. v. Fitzgerald, 137 U. S. 98, 111, 11 S. Ct. 36, 34 L. Ed. 608; Monmouth Inv. Co. v. Means (C. C. A. 8) 151 F. 159, 167; Ebner v. Alaska Mildred Gold Mining Co. (C. C. A. 9) 167 F. 456; Moon Motor Car Co. v. Moon (C. C. A. 8) 58 F.(2d) 90. The same fiduciary relationship prohibits officers from voting themselves backpay,—compensation to which they were not entitled when the service was performed. Thompson on Corporations, § 1879. All transactions between officers of a corporation, involving corporate properties, are subject to the closest scrutiny. "A chancellor should probe such a transaction to the very marrow," to borrow the language of Judge John F. Philips in Monmouth Inv. Co. v. Means, supra.

■ But these salutary and settled principles do not proscribe the employment of an officer for tasks other than those imposed upon him by his office. The rule is accordingly well settled that where an officer of a corporation, at the request or with the acquiescence of other authorized officers, renders services clearly outside of his ordinary official duties, under circumstances which raise a presumption that the parties should have understood that they were to be paid for, he may recover reasonable compensation therefor. Fitzgerald Const. Co. v. Fitzgerald, 137 U. S. 98, 111, 11 S. Ct. 36, 34 L. Ed. 608; Corinne Mill, Canal & Stock Co. v. Toponce, 152 U. S. 405, 14 S. Ct. 632, 38 L. Ed. 493; National Loan & Investment Co. v. Rockland Co. (C. C. A. 8) 94 F. 335; Montana Tonopah Mining Co. v. Dunlap (C. C. A. 9) 196 F. 612; Denman v. Richardson (C. C. A. 9) 292 F. 19, 23; Tietsort v. Irwin (C. C. A. 6) 9 F.(2d) 65; Church v. Harnit (C. C. A. 6) 35 F.(2d) 499, certiorari denied 281 U. S. 732, 50 S. Ct. 247, 74 L. Ed. 1148; Crown Central Petroleum Corp. v. Bates (C. C. A. 5) 37 F.(2d) 508, certiorari denied 281 U. S. 743, 50 S. Ct. 348, 74 L. Ed. 1156; Pew v. First Nat. Bank, 130 Mass. 391, 395; Wilgus, Cases on Private Corporations, p. 1757; Thompson on Corporations, (3d Ed.) Ch. 66, §§ 1825–1829; Subject note, L. R. A. 1917F, 319. In the Fitzgerald Case, supra, it was held that it was outside of the official duties proper of the treasurer of a private corporation to go to expense and trouble to procure finances for the company.

■ It is obvious that, in applying these rules, we must first ascertain what duties are imposed by the office. We look to the by-laws, but our search does not end there, as appellants urge. We must look to the other facts and circumstances, and particularly to the question of the salary attached to the office, for the question of what duties the parties intended should be performed by an officer, is one of fact. A President, serving without pay, is expected to attend meetings of the Board, to sign stock certificates, and generally to advance the corporate interests in such ways as non-salaried officers usually do. Such a President cannot reasonably be expected to devote his full time to corporate affairs, any more than a lawyer-director, serving without pay, can be expected to attend to corporate litigation without compensation. The facts of this case bear the closest scrutiny, and clearly support the judgment below. It could not reasonably be expected that Governor MacCorkle, a lawyer of Charleston, would devote a considerable part of his time in traveling from city to city in an effort to re-finance a New Mexico corporation, without some compensation. Such activities are entirely outside of the official duties of a director or President who serves without pay.

Appellants then urge that if he is entitled to any pay, it is as salary and not as com-

pensation, and advances reasons why it cannot be paid if labeled "salary." It appears that when MacCorkle was elected President there was an informal agreement by the board that he should be paid a salary of $5,000 a year; but the corporation was in financial straits, and he did not draw any of it. When the corporation was about to be sold, he agreed to accept $6,000 in full for his three years' services. Appellants argue that this is salary and not compensation. But that is drawing too fine a bow. The witness Porter spoke of the payment at times as "salary" and at times as "compensation." But this litigation cannot turn upon the characterization of a witness; the fact is that Governor MacCorkle rendered much valuable service over and above the purely official duties of a President; the compensation agreed upon is modest; the claim is just, and it ought to be paid.

There being no infirmity in the note, it is unnecessary to pass upon the question of whether the appellee is a holder in due course. The authorities cited bear upon the situation where a note is assigned for collection, or to an assignee for the benefit of creditors. No case has been cited holding that where a note is transferred to A, to secure an existing indebtedness to B, that A may not be a holder in due course. Cf. Commissioners of Johnson County v. Thayer, 94 U. S. 631, 644, 24 L. Ed. 133; Kinkel v. Harper, 7 Colo. App. 45, 42 P. 173; Curtis v. Leavitt, 15 N. Y. 194.

The judgment is affirmed.